STATE OF NORTH CAROLINA v. LEONARD BALDWIN

No. 574A90

(Filed 10 January 1992)

1. **Criminal Law § 1352 (NCI4th) — capital sentencing — mitigating circumstances — state constitution — right to unanimous verdict**

   A murder defendant did not suffer any prejudice as a result of the denial of his motion to prohibit the State from seeking the death penalty where defendant was tried capitally but received a sentence of life imprisonment upon the jury's recommendation. Although defendant contended that North Carolina's capital sentencing pattern jury instructions, which authorize consideration of mitigating circumstances found by one or more jurors, deprive criminal defendants of the right to a unanimous jury verdict, neither article I, section 24 nor any other provision of the North Carolina Constitution requires that a defendant's sentence be based upon a unanimous recommendation of a jury.

   **Am Jur 2d, Criminal Law §§ 598-600; Homicide § 548; Trial §§ 1754, 1760.**

2. **Evidence and Witnesses § 90 (NCI4th) — defendant's statements to psychologist — basis of opinion — prejudicial effect — excluded**

   The trial court did not err in a murder prosecution by prohibiting defendant's psychologist from testifying concerning the statements made by defendant during his interviews with the psychologist. Although defendant contended that defendant's hearsay statements were admissible as the facts or data underlying the expert's opinion testimony, the trial court determined that the probative value of defendant's statements was substantially outweighed by the prejudicial effect of such statements. Given that defendant had not yet produced any substantive evidence concerning the matters raised in his statement, it cannot be said that the trial court abused its discretion in excluding the evidence due to possible juror confusion.

   **Am Jur 2d, Expert and Opinion Evidence §§ 228-230, 240.**

   **Admissibility of testimony of expert, as to basis of his opinion, to matters otherwise excludable as hearsay — state cases. 89 ALR4th 456.**

3. **Evidence and Witnesses § 2174 (NCI4th) — defendant's statements to psychologist — excluded basis of opinion — defendant not forced to testify**

A defendant in a murder prosecution was not forced to testify by the exclusion of statements made by defendant to the psychologist because the psychologist was permitted to testify concerning his evaluation of defendant, the opinions and conclusions reached as a result of the evaluation, and the facts and data upon which he relied in making his determinations. The substance of defendant's statements was not necessary to explain the testimony.

**Am Jur 2d, Criminal Law § 936; Expert and Opinion Evidence §§ 228-230, 240.**

4. **Evidence and Witnesses § 90 (NCI4th) — murder — defendant's statements to psychologist excluded — psychologist's opinion of confession**

The exclusion of a murder defendant's statements to his psychologist did not deprive defendant of an expert witness in psychological testing and evaluation where the court permitted defense counsel to question the psychologist concerning his determinations of defendant's intellectual ability, problem solving abilities, and pattern of relationships. The court's ruling merely prohibited the expert from disclosing the substance of defendant's hearsay statements and from giving an opinion as to the validity or completeness of defendant's confession.

**Am Jur 2d, Expert and Opinion Evidence §§ 41, 228-230, 240.**

**Admissibility of testimony of expert, as to basis of his opinion, to matters otherwise excludable as hearsay — state cases. 89 ALR4th 456.**

5. **Evidence and Witnesses § 2152 (NCI4th) — murder — psychologist's opinion that confession incomplete — excluded**

The trial court did not err by excluding a psychologist's proposed testimony regarding the completeness or validity of a murder defendant's confession. The psychologist was permitted to relate extensive findings from which the jury could have inferred that defendant's confession was incomplete, inaccurate, or invalid.

**Am Jur 2d, Expert and Opinion Evidence § 240.**

STATE v. BALDWIN

[330 N.C. 446 (1992)]

6. **Evidence and Witnesses § 2302 (NCI4th)— murder—state of mind—psychologist's opinion—not admitted—no prejudice**

There was no prejudice in a murder prosecution where the court refused to permit a psychologist to give an opinion as to defendant's state of mind at the time of the shooting. State of mind evidence was presented and defendant failed to make an offer of proof.

**Am Jur 2d, Expert and Opinion Evidence § 359; Homicide §§ 395, 406.**

7. **Homicide § 28.6 (NCI3d)— murder by lying in wait—voluntary intoxication—refusal to instruct—no error**

Voluntary intoxication is irrelevant to a charge of first degree murder by lying in wait, a crime that does not require a finding of specific intent, because voluntary intoxication may only be considered as a defense in specific intent crimes.

**Am Jur 2d, Homicide §§ 49, 127-129, 498, 517.**

**Modern status of rules as to voluntary intoxication as defense to criminal charge. 8 ALR3d 1236.**

8. **Homicide § 28.6 (NCI3d)— murder—voluntary intoxication—refusal to instruct—no error**

The evidence was insufficient to support an instruction on voluntary intoxication where the only evidence concerning defendant's alcohol and drug consumption was elicited from defendant on cross-examination by the State and the evidence presented in the case was insufficient to show that defendant was so intoxicated that he was incapable of forming the intent necessary to commit first degree premeditated and deliberated murder.

**Am Jur 2d, Homicide §§ 498, 517.**

**Modern status of rules as to voluntary intoxication as defense to criminal charge. 8 ALR3d 1236.**

9. **Homicide § 25 (NCI4th)— murder—instruction on lying in wait—no error**

The trial court did not err in a homicide prosecution by instructing the jury on murder by lying in wait where the evidence showed that defendant armed himself with a .357

magnum, went to the victim's home and hid in a closet within the victim's bedroom, and fired three shots and killed the victim when he opened the closet door.

**Am Jur 2d, Homicide §§ 49, 534.**

**10. Homicide § 28.1 (NCI4th) — murder — imperfect self-defense — instruction not given — no error**

The trial court did not err by refusing to instruct the jury on imperfect self-defense in a homicide prosecution where the uncontradicted evidence shows that the events leading to the shooting were initiated by defendant with murderous intent; defendant, by his own testimony, armed himself, went to the victim's house, and hid in the closet for the purpose of killing the victim; and defendant testified that he received $300 for the killing and was supposed to have received $40,000.

**Am Jur 2d, Homicide § 519.**

APPEAL as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment entered by *Gaines, J.,* at the 23 July 1990 Criminal Session of Superior Court, MECKLENBURG County, upon a jury verdict finding defendant guilty of first-degree murder. Defendant's motion to bypass the Court of Appeals as to his conviction of conspiracy to commit murder was allowed by this Court on 4 January 1991. Heard in the Supreme Court 15 November 1991.

*Lacy H. Thornburg, Attorney General, by Tiare B. Smiley, Special Deputy Attorney General, for the State.*

*Jean B. Lawson for defendant-appellant.*

MEYER, Justice.

Defendant was indicted for the murder and conspiracy to commit the murder of Roosevelt Bates and was tried capitally at the 23 July 1990 Criminal Session of Superior Court, Mecklenburg County. The jury returned verdicts finding defendant guilty of conspiracy to commit murder and first-degree murder on the theories of premeditated and deliberated murder and murder perpetrated by lying in wait. Following a sentencing proceeding conducted pursuant to N.C.G.S. § 15A-2000, the jury determined that the sixteen mitigating circumstances found were sufficient to outweigh the

STATE v. BALDWIN

[330 N.C. 446 (1992)]

one aggravating circumstance found and accordingly recommended a sentence of life imprisonment. The trial court, following the recommendation of the jury, sentenced defendant to life imprisonment for the murder of Bates and imposed a consecutive sentence of ten years' imprisonment for the conspiracy conviction.

On appeal, defendant brings forward numerous assignments of error. After a thorough review of the transcript of the proceedings, record on appeal, briefs, and oral arguments, we conclude that defendant received a fair trial free of prejudicial error, and we therefore affirm his convictions and sentences.

The evidence presented by the State at trial tended to show that Roosevelt Bates was the victim of a contract killing—that he was killed by defendant for money at the behest of the victim's girlfriend, Doretha Weathers, and pursuant to a plan devised by defendant and Weathers. According to the State's evidence, defendant was approached by his friend, Darwin Mobley, on 3 August 1989. Mobley said that he knew a woman who wanted defendant "to do something for her." Defendant agreed to go with Mobley to see the woman, and the two went to an apartment shared by Weathers and Bates. Weathers told defendant her name was Doretha and asked defendant if he would kill someone for $2,000. Defendant asked "who," and Weathers replied that she wanted her boyfriend killed. Defendant told Weathers that he would have to think about it and that he would "get back up with her." Defendant and Mobley then left. Mobley asked defendant if he was going to do it, and defendant replied, "I'll think about it."

At approximately 7:30 or 8:00 p.m. that evening, defendant was awakened at his home by Mobley. Mobley told defendant that a gun could be obtained from Jay Jones. Defendant and Mobley then walked toward Jones' house. Jones met them and said that he had only one bullet. Mobley asked Baldwin if he could do it with one bullet, and defendant said "No." Defendant, Mobley, and Jones then proceeded to Jones' house where Jones retrieved a .357 magnum, and the three then walked back to Mobley's home. They remained at Mobley's apartment until approximately 9:30 p.m. when they walked outside to watch a fight in the parking lot. Mobley left and returned a short time later with three bullets. Mobley took the gun, which already had one bullet in it, loaded three more bullets into the gun, and handed it to defendant.

At 9:55 p.m., defendant, carrying the loaded gun, walked with Mobley and Jones to Weathers' apartment. Defendant told Weathers that he had never shot anyone before. Weathers responded, "Don't worry, this is my third person I've done like this. . . . Third Boyfriend." Defendant and Weathers then walked into the apartment. Weathers escorted defendant to a bedroom, opened the closet door, and told defendant to get into the closet. Weathers told defendant that she would tell her boyfriend to get the sewing machine out of the closet and that when he came, defendant should shoot him. Defendant stepped into the closet and stood waiting, with his arms extended, pointing the gun at the closet door. About thirty seconds later, the bedroom light was turned on. The closet doors opened, and defendant saw Bates. Defendant aimed the gun and fired three shots, killing Bates. Weathers then rushed into the room and told defendant that he should leave and that she would pay him the next day.

After the shooting, defendant hid the gun in the woods and walked to Mobley's apartment. He told Mobley that he had shot the man and that he was going to turn himself in. Mobley told defendant that it would be "dumb" to do that and suggested that defendant go home. After defendant returned home, Jones came to defendant's house looking for the gun. Defendant retrieved the gun from the woods and handed it to Jones. At Jones' request, defendant gave Jones some alcohol which Jones used to clean the gun.

The next day, defendant went with Jones to Mobley's apartment. Mobley left and returned with a bag containing approximately $1,500.00. Mobley reached into the bag, handed defendant $300.00, and told defendant that Weathers would pay him the rest of the money later.

On 23 August 1989, defendant was arrested and questioned about the shooting. Initially, defendant denied any knowledge of the shooting and claimed that he had been across town at the time of the shooting. In response to being told that he had been implicated in the shooting, defendant stated, "Okay, I'll tell you about it."

Defendant then gave a statement, which was reduced to written form and signed by defendant, detailing the events of 3 August 1989. This statement was admitted into evidence at defendant's trial and, together with an out-of-court identification made by Weathers, served as the State's primary evidence against defendant.

Other evidence presented by the State included testimony concerning the investigation of the Bates' shooting. According to the testimony of two police officers, Bates' body was discovered lying face forward in the closet of a bedroom in his home. His "left arm was bent slightly near the upper portion of his body. His right arm was extended up and above his head into the closet area." A search of the victim's pockets revealed approximately $1,000.00 in cash, and in his right front pants pocket a small caliber pistol was found "down deep in the pocket" with the money on top. An autopsy of Bates' body established that he died as a result of two gunshot wounds to the upper left chest. One additional bullet was removed from the ceiling of the bedroom in which Bates' body was found.

A firearms examiner testified that he test-fired a .357 magnum that the police recovered from Jones. He stated that the trigger pull on the .357 magnum was normal—it was not a "hair trigger." He further testified that the two bullets recovered from Bates' body were of a different manufacture from the bullet recovered from the ceiling but all three had been fired by the .357 magnum obtained from Jones.

Throughout the trial, defense counsel proceeded on the theory that defendant was mentally incapable of planning and executing a plan of murder. Dr. Daniel Biber, an expert in psychological evaluations and testing, testified that he had performed a psychological evaluation of defendant in July 1990. Dr. Biber testified that his evaluation of defendant revealed that defendant thinks very concretely; that due to his inability to think things out, defendant is intellectually unable to plan future courses of behavior or evaluate alternatives; that defendant tends to take direction from others and is easily led by and dependent upon others; and that defendant is "easily lead [sic] in an interview" and may when making a statement or answer give an incomplete response.

Defendant testified that Mobley asked defendant if he would "kill somebody for $40,000.00" but that he never agreed to kill anyone. Defendant claimed that he went to the home of Bates and Weathers because he was scared that Weathers would have him killed. Defendant testified, "[Jones] told me that if I didn't kill the guy that Ms. Weathers would have somebody to kill me." Defendant also stated that on the day of the shooting "this boy named Donald Young approached me and put a small revolver

to my side and pulled the trigger twice. . . . That made me think that that Lady was serious about having me killed if I didn't kill Mr. Bates."

In order to corroborate defendant's testimony of the alleged threat by Young, defense counsel also presented testimony of Mobley. Mobley testified that he saw Young threaten defendant by pointing a gun at him. However, on cross-examination, Mobley further stated that at the time of the threat, Young "said something about [defendant] messing with [Young's] nephews and talking about [Young]." This was the only evidence presented to explain Young's action and it in no way connected the threat made by Young to Weathers.

Defendant further testified that Weathers led him into the closet and told him "to stand in the closet until the bedroom light come [sic] on and that. would be him and for me to shoot him." Defendant testified that he was scared and that when the door opened he was surprised. Up until that moment, defendant stated, he had not known whom he was supposed to shoot. When he saw Bates, he recognized him and did not intend to shoot him. Defendant also claimed that he saw a gun handle sticking out of Bates' pocket and that he fired two shots as Bates reached for the gun in his pocket.

Based on testimony elicited from defendant, Dr. Biber, and other witnesses, defense counsel argued to the jury that defendant was a "pawn" in a conspiracy to kill Bates; that he never agreed to and never intended to kill Bates; that he feared for his life; that he was scared to tell Weathers that he would not kill Bates; and that when the closet door opened defendant wanted out of the closet and did not know how to get out, that his act of shooting was a simple reaction "to what he believed was an imminent threat of danger to himself."

I.

[1] Defendant first contends that the trial court erred in denying his motion to prohibit the State from seeking the death penalty. Defendant argues that North Carolina's capital sentencing pattern jury instructions, which authorize consideration of mitigating circumstances found by one or more jurors, deprive criminal defendants of the right to a unanimous jury verdict as required by Article I, Section 24 of the North Carolina Constitution. We disagree.

Article I, Section 24 provides that "[n]o person shall be *convicted* of any crime but by the unanimous verdict of a jury in

open court." (Emphasis added.) This section, as its plain language states, applies to the determination of a defendant's guilt of the crime charged. A defendant cannot be convicted except upon a unanimous jury verdict "as to every essential element of the crime charged." *State v. Denning*, 316 N.C. 523, 524, 342 S.E.2d 855, 856 (1986).

Never has this Court construed Article I, Section 24 or any other provision of the North Carolina Constitution as requiring that a defendant's *sentence* be based upon a unanimous recommendation of a jury.[1] In fact, we expressly rejected this claim in *State v. Denning*, 316 N.C. 523, 342 S.E.2d 855. In *Denning*, the defendant, convicted of driving while impaired, contended that a trial judge's consideration of prior convictions as aggravating factors violated his constitutional right to a trial by jury. We disagreed, holding that aggravating factors are not elements of the offense charged and that "their consideration for purposes of sentencing is . . . not susceptible to constitutional challenge based upon either the sixth amendment right to a jury trial or article I, section 24 of the North Carolina Constitution." *Id.* at 524, 342 S.E.2d at 856.

Our opinion in *State v. McKoy*, 327 N.C. 31, 394 S.E.2d 426 (1990), also demonstrates that our Constitution does not require that mitigating circumstances be unanimously found by the jury. In *McKoy*, we were faced with the question of whether North Carolina's capital sentencing statute was invalidated by the United States Supreme Court's decision in *McKoy v. North Carolina*, 494 U.S. 433, 108 L. Ed. 2d 369 (1990). McKoy argued that the unanimity instructions held unconstitutional in *McKoy v. North Carolina* were required by N.C.G.S. § 15A-2000. After analyzing our prior opinions, N.C.G.S. § 15A-2000, and Article I, Section 24 of our Constitution, we concluded that North Carolina's prior instructions, which required a unanimous finding of mitigating circumstances, were judicially approved based on "the interest of 'consistency and fairness' " and were not constitutionally or statutorily required. *State v. McKoy*, 327 N.C. at 38, 394 S.E.2d at 430.

---

1. In *State v. Kirkley*, 308 N.C. 196, 302 S.E.2d 144 (1983), we stated that "a verdict of death in a capital case must be by unanimous vote of the twelve jurors." *Id.* at 218, 302 S.E.2d at 156 (citing *State v. Cherry*, 298 N.C. 86, 257 S.E.2d 551 (1979)). We note, however, that our holding in *Cherry* and our subsequent statement in *Kirkley* concerned the sentencing procedure established by the legislature in N.C.G.S. § 15A-2000. Neither of these cases in any way intimated that the unanimity required in a jury's sentencing recommendation is constitutionally mandated.

STATE v. BALDWIN

[330 N.C. 446 (1992)]

Moreover, even assuming *arguendo* that Article I, Section 24 requires that a jury's sentencing recommendation be supported by unanimous findings of mitigating circumstances, we fail to see how defendant suffered any prejudice as a result of the denial of his motion to prohibit the State from seeking the death penalty. Defendant was tried and convicted of first-degree murder. Although tried capitally, defendant was not sentenced to death but received a sentence of life imprisonment upon the jury's recommendation. Had defendant been tried noncapitally and convicted of first-degree murder, he nevertheless would have received a sentence of life imprisonment. *See* N.C.G.S. § 14-17 (Supp. 1991). Therefore, even assuming error *arguendo* and further that it was of constitutional magnitude under the North Carolina Constitution, any such error was harmless under the particular facts of this case.

## II.

Defendant also assigns as error several rulings made by the trial court concerning testimony that defense counsel sought to elicit from defendant's expert psychologist, Dr. Daniel Biber. After Dr. Biber was tendered and accepted as an expert in psychological evaluations and testing, defense counsel sought to question Dr. Biber as to his opinion of defendant's state of mind at the time of the killing. The court held a voir dire during which Dr. Biber testified that he had personally interviewed defendant on three occasions and that during the interviews, defendant recounted the sequence of events surrounding the shooting. Dr. Biber further indicated that it was his opinion that the confession given by defendant to the police was inaccurate and that defendant shot the victim out of fear and in an attempt to protect himself from the victim.

Based upon Dr. Biber's voir dire testimony, the trial court found as facts that Dr. Biber was retained by defense counsel to make a psychological diagnosis of defendant "in three areas, a) intellectual ability, b) problem solving ability, and c) Defendant's pattern of relating to people (i.e., was he a leader or a follower)." The court ordered that Dr. Biber could testify as to his opinion concerning defendant's intellectual ability, problem-solving ability, and pattern of relating to other people and could state that his opinions, conclusions, and diagnoses were based on interviews with defendant. The court further ordered, however, that Dr. Biber could not testify concerning the substance of "any self-serving, exculpatory statements made to him by the Defendant during [the] interviews"

STATE v. BALDWIN

[330 N.C. 446 (1992)]

"unless or until the Defendant has testified in this matter with regards to matters related to those statements made to the Doctor."

[2] Defendant first argues that the trial court erred in prohibiting defendant's psychologist from testifying concerning the statements made by defendant during his interviews with the psychologist. Defendant apparently asserts that defendant's hearsay statements were the facts or data underlying the expert's opinion testimony and were therefore admissible under N.C. R. Evid. 705. We find no merit in defendant's argument.

Rule 705 does not, as defendant contends, make the bases for an expert's opinion automatically admissible. This rule, entitled "Disclosure of facts or data underlying expert opinion," merely provides:

> The expert may testify in terms of opinion or inference and give his reasons therefor without prior disclosure of the underlying facts or data, unless an adverse party requests otherwise, in which event the expert will be required to disclose such underlying facts or data on direct examination or voir dire before stating the opinion. *The expert may in any event be required to disclose the underlying facts or data on cross-examination.* There shall be no requirement that expert testimony be in response to a hypothetical question.

N.C. R. Evid. 705 (emphasis added). As noted in the official commentary, the primary purpose of this rule was to enable an "expert to give his opinion without prior disclosure of the underlying facts unless an adverse party requests otherwise." N.C. R. Evid. 705 official commentary. Only if an adverse party requests disclosure must the trial court require the expert to disclose the underlying facts of his opinion. Rule 611 vests the trial court with authority to "exercise reasonable control over the mode and order" of interrogation and presentation of the evidence. N.C. R. Evid. 611. Whether or not to exclude relevant but prejudicial evidence is a matter within the sound discretion of the trial court. *State v. Penley*, 318 N.C. 30, 41, 347 S.E.2d 783, 789 (1986); *see* N.C. R. Evid. 403. Such a decision " 'may be reversed for abuse of discretion only upon a showing that [the trial court's] ruling was manifestly unsupported by reason and could not have been the result of a reasoned decision.' " *Penley*, 318 N.C. at 41, 347 S.E.2d at 789 (quoting *State v. Riddick*, 315 N.C. 749, 756, 340 S.E.2d 55, 59 (1986)).

**STATE v. BALDWIN**

[330 N.C. 446 (1992)]

We find that the trial court's decision to exclude the evidence of defendant's hearsay statements was amply supported by reason and constituted a proper exercise of the trial court's discretion. As noted by the trial court, the statements made by defendant to his psychologist were self-serving, exculpatory statements raising matters relating to several defenses, including self-defense, coercion, intimidation, and duress. At the time that defendant sought to elicit this information from his psychologist, there had been no evidence presented to establish any of these defenses. The court determined that the hearsay statements would be probative for the purpose of "showing how the Psychologist formed his opinion" and properly weighed the probative value against the prejudicial effect of defendant's statements. The court determined that "the probative value of [defendant's statements] is substantially outweighed by the prejudicial effect of such statements in that they raise issues likely to confuse the Jury and are not reasonably necessary for an explanation by the Physician of the basis for his conclusions relating to the three areas of his investigation." After considering the alternative of giving a limiting instruction, the court concluded that "any limiting instruction by the Court to the Jury concerning such matters cannot reasonably be expected to exclude such matters from the Jury's deliberation of the issues in this case." Given that defendant had not yet produced any substantive evidence concerning the matters raised in his statement, we cannot say that the trial court abused its discretion in excluding the evidence due to possible juror confusion. *See* N.C. R. Evid. 403 (vesting the trial court with discretion to exclude evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury").

[3] We further reject defendant's argument that this ruling "forced the defense to put the defendant on the stand to justify the expert conclusions of the psychologist." The trial court's ruling expressly permitted defendant's psychologist to testify concerning his evaluation of defendant and the opinions and conclusions reached as a result of the evaluation. With the exception of the substance of defendant's hearsay statements, the psychologist was further permitted to testify concerning the facts and data upon which he relied in making his determinations. The substance of defendant's statements was not necessary to explain the psychologist's testimony, and therefore the exclusion of this hearsay evidence could not

have forced defendant to take the stand to support the expert's conclusions.

[4] Defendant further argues that the exclusion of defendant's statements to his psychologist "precluded the defense from using an expert witness in psychological testing and evaluation to show that the defendant's confession was grossly incomplete by virtue of his limited and impaired intellectual functioning." We disagree. The record in this case quite clearly shows that the trial court permitted defense counsel to question the psychologist concerning his determinations of defendant's intellectual ability, problem-solving abilities, and pattern of relationships. The trial court's ruling merely prohibited the expert from disclosing the substance of defendant's hearsay statements and from giving an opinion as to the validity or completeness of defendant's confession.

As noted above, the trial court properly exercised the discretion afforded it under Rule 403 when it refused to permit the psychologist to testify to the substance of defendant's hearsay statements.

[5] With regard to the trial court's exclusion of the proffered expert opinion that defendant's confession was "grossly incomplete," we find no error. "Although an expert's opinion testimony is not objectionable merely because it embraces an ultimate issue, it must be of assistance to the trier of fact in order to be admissible." *State v. Jackson*, 320 N.C. 452, 459-60, 358 S.E.2d 679, 683 (1987); *see also* 1 Henry Brandis, Jr., *Brandis on North Carolina Evidence* § 126 (3d ed. 1988). Where an expert's opinion testimony concerns matters with which the expert has no special knowledge, skill, experience, training, or education, the opinion would not be of assistance to the trier of fact, and the evidence is properly excluded. *See State v. Jackson*, 320 N.C. 452, 358 S.E.2d 679. The jurors in this case heard the evidence concerning defendant's alleged inability to give complete statements or answers, and they were in as good a position as Dr. Biber to determine whether defendant's confession to the police was "grossly incomplete."

In the case *sub judice*, the record reveals that the trial court properly limited the psychologist's testimony to the subjects of his psychological evaluation of defendant. The trial court did not preclude defendant from presenting evidence that defendant's statement to the police was inaccurate or incomplete. The record shows that the trial court ruled that the psychologist would not be permit-

ted "to testify to his opinion as to the validity of any confession or whether that confession contains all the things that he thinks ought to be. in it or not." From this portion of the transcript, it becomes apparent that the trial court's ruling merely prohibited the psychologist from giving an opinion as to the legal validity of defendant's confession. This ruling was a correct application of our well-established rule prohibiting expert opinion testimony concerning matters that require legal interpretations. *See State v. Ledford*, 315 N.C. 599, 617, 340 S.E.2d 309, 320 (1986) (stating that "an expert may not testify that a particular legal conclusion or standard has or has not been met, at least where the standard is a legal term of art which carries a specific legal meaning not readily apparent to the witness"); *State v. Smith*, 315 N.C. 76, 337 S.E.2d 833 (1985).

Moreover, although limited to the subject matter of his evaluation, the psychologist was permitted to relate extensive findings from which the jury could have inferred that defendant's confession was incomplete, inaccurate, or invalid. Following the trial court's ruling, the psychologist testified that he had administered tests to determine defendant's IQ; that on the verbal IQ test, which measures a person's ability to respond orally to questions, defendant obtained a rating of 84, within the sixteenth percentile; that the testing revealed that defendant's "overall IQ was an 80," or within the ninth percentile; and that defendant's IQ level was characterized as "dull normal intelligence" or "borderline retardation." The psychologist further testified that his evaluation of defendant revealed that defendant's limited intellectual abilities inhibited his ability to respond to questioning:

> [Defendant] can in a situation like giving information fail to mention stuff that might be germane either because he hasn't thought of it at the moment or it hasn't been triggered. He is easily lead [sic] in an interview. . . .
>
> . . . .
>
> . . . It is very possible that a statement he would give or answers he would give would be incomplete.

Although this evidence was elicited following defendant's testimony, there is nothing in the record to suggest that the trial court conditioned the admissibility of this testimony on defendant's testifying. We conclude that the trial court did not err in excluding Dr. Biber's

proposed testimony as to the completeness or validity of defendant's confession.

[6] Defendant further argues that the trial court erred in refusing to permit the psychologist to give an opinion as to defendant's state of mind at the time of the shooting. We agree with defendant that expert opinion testimony concerning a defendant's state of mind is admissible to negate the first-degree murder elements of premeditation and deliberation. *See State v. Shank*, 322 N.C. 243, 367 S.E.2d 639 (1988). However, we conclude that defendant has failed to establish that the trial court's ruling constituted prejudicial error.

The record in this case reveals three instances where defendant sought to elicit from the psychologist testimony concerning defendant's state of mind at the time of the shooting. On the first occasion, the psychologist responded that defendant told him "[h]e was fearful, scared for his life at that moment." The trial court sustained the State's objection to this question and instructed the jury to disregard the psychologist's response. On the two other occasions that defense counsel attempted to offer evidence of defendant's state of mind, the trial court sustained the State's objections prior to the psychologist's response. At no point did defense counsel seek to make an offer of proof to preserve the substance of the excluded testimony.

After examining the record as a whole, we conclude that defendant has failed to show that the trial court's ruling precluded him from presenting evidence of his state of mind. In support of defendant's theory that he "did not have the ability to plan" the murder, the psychologist testified on direct examination that defendant is unable to "initiate significant action on his own. He is likely to be very . . . group dependent . . . . In other words, it is very easy for him to be swept along in group behavior." In addition, Dr. Biber testified that it was his opinion "that [defendant] was incapable of functioning independently in planning" or carrying out a plan of murder.

Furthermore, the record reveals that the psychologist testified concerning defendant's state of mind prior to and at the time of the shooting. Dr. Biber testified that defendant stated that prior to going into the victim's apartment, someone put a gun in his side; that defendant perceived this as a warning and feared "that if he did not go through with [the killing] that he himself would

become [the] victim." Based on statements made. by defendant, the psychologist was also allowed to testify that immediately before the shooting, defendant saw the victim, who was a "big black man" weighing approximately three hundred pounds; that defendant and the victim stared at each other for a moment; that defendant thought the victim was reaching for a weapon; and that defendant shot in order "to get away, not to kill." In light of the state of mind evidence presented and due to defendant's failure to make an offer of proof showing that he was precluded from presenting additional evidence of his state of mind, we are unable to conclude that the trial court's ruling constituted prejudicial error.[2] We therefore overrule this assignment of error.

III.

In his next assignment of error, defendant contends that the trial court erred in refusing to instruct the jury on the defense of voluntary intoxication. Because defendant was convicted of first-degree murder by premeditation and deliberation and first-degree murder perpetrated by lying in wait, we address the applicability of this defense as to each crime.

A.

[7] Defendant argues that the defense of intoxication is relevant to a charge of first-degree murder perpetrated by lying in wait because it negates any intent to kill and intent to lie in wait. However, we have previously held "that a specific intent to kill is not an element of the crime of first-degree murder by lying in wait" and that evidence of intoxication is not relevant in this regard. *State v. Leroux*, 326 N.C. 368, 377-78, 390 S.E.2d 314, 321, *cert. denied*, --- U.S. ---, 112 L. Ed. 2d 155 (1990); *see also State v. Brown*, 320 N.C. 179, 358 S.E.2d 1, *cert. denied*, 484 U.S. 970, 98 L. Ed. 2d 406 (1987). We further reject defendant's argument that murder by lying in wait requires an intent to lie in wait that may be negated by a showing of voluntary intoxication. As demonstrated by our prior opinions, lying in wait is a physical act. *State v. Allison*, 298 N.C. 135, 147-48, 257 S.E.2d 417, 425

---

2. Because we conclude that defendant has failed to show that he was precluded from presenting any state of mind evidence in defense of the charge of first-degree premeditated and deliberated murder, we do not address the question of whether the trial court's ruling should be deemed harmless as a result of defendant's conviction of first-degree murder perpetrated by lying in wait.

(1979) (stating that a person "who watches and waits in ambush for his victim is most certainly lying in wait"); *see, e.g., State v. Leroux,* 326 N.C. 368, 390 S.E.2d 314 (sneaking around a dark golf course constitutes lying in wait); *State v. Brown,* 320 N.C. 179, 358 S.E.2d 1 (waiting outside window for victim to bend down constitutes lying in wait). Like poison, imprisonment, starving, and torture — the other physical acts specified in N.C.G.S. § 14-17 — lying in wait is a method employed to kill. *State v. Johnson,* 317 N.C. 193, 203, 344 S.E.2d 775, 781 (1986). It does not require a finding of any specific intent. Because voluntary intoxication may only be considered as a defense to specific intent crimes, *State v. McLaughlin,* 286 N.C. 597, 606, 213 S.E.2d 238, 244 (1975), *sentence vacated,* 428 U.S. 903, 49 L. Ed. 2d 1208 (1976), it is therefore irrelevant to a charge of first-degree murder by lying in wait, a crime that does not require a finding of specific intent.

B.

**[8]** It is well established that "specific intent to kill is a necessary constituent of the elements of premeditation and deliberation in first degree murder, and a showing of legal intoxication to the jury's satisfaction will mitigate the offense to murder in the second degree." *McLaughlin,* 286 N.C. at 606, 213 S.E.2d at 244. However, it is equally well established that an instruction on voluntary intoxication is not required in every case in which a defendant claims that he killed a person after consuming intoxicating beverages or controlled substances. *See, e.g., State v. Strickland,* 321 N.C. 31, 361 S.E.2d 882 (1987); *State v. McLaughlin,* 286 N.C. 597, 213 S.E.2d 238; *State v. Doss,* 279 N.C. 413, 183 S.E.2d 671 (1971), *sentence vacated,* 408 U.S. 939, 33 L. Ed. 2d 762, *on remand,* 281 N.C. 751, 191 S.E.2d 70 (1972). In order to support a defense of voluntary intoxication, substantial evidence must be presented to show that at the time of the killing the defendant was so intoxicated that he was "'utterly incapable of forming a deliberate and premeditated purpose to kill.'" *Strickland,* 321 N.C. at 41, 361 S.E.2d at 888 (quoting *State v. Medley,* 295 N.C. 75, 79, 243 S.E.2d 374, 377 (1978)). In the absence of evidence of intoxication to this degree, the court is not required to charge the jury on the defense of voluntary intoxication. *Id.*

The State asserts that defendant did not produce sufficient evidence to support an instruction on voluntary intoxication. We agree. At no point during the trial did defense counsel introduce

or seek to introduce any evidence to establish that defendant was so intoxicated that he was unable to form the intent necessary to commit first-degree premeditated and deliberated murder. The only evidence concerning defendant's alcohol and drug consumption was elicited from defendant on cross-examination by the State. This evidence, viewed in the light most favorable to defendant, shows only that at some time during the afternoon on 3 August 1989, defendant went to a neighbor's house, drank "about five or six" beers, and smoked marijuana and cocaine with three of his friends. When further questioned by the prosecutor, defendant stated that he had no idea how much marijuana or cocaine he had smoked that day. It was apparently after this that defendant and Mobley walked to Jones' house, obtained a .357 magnum and one bullet from Jones, and walked back to Mobley's house. Defendant testified that he (and apparently Jones) "sat in [Mobley's] house for a long period of time and [Mobley] went to get some more bullets." It was not until 10:00 p.m. that evening that the shooting occurred. When questioned concerning his state of intoxication at the time he entered the victim's home, defendant replied, "I wasn't high. I was coming down off of it."

We conclude that the evidence presented in this case—that defendant drank "about five or six" beers and consumed an indeterminate amount of marijuana and cocaine at some time earlier in the day—was insufficient to show that defendant was so intoxicated that he was incapable of forming the intent necessary to commit first-degree premeditated and deliberated murder. We therefore overrule this assignment of error.

IV.

[9] Next, defendant contends that the trial court erred in instructing the jury on first-degree murder perpetrated by lying in wait. Defendant argues that murder by lying in wait "presupposes premeditation and deliberation" and a "specific intent to kill or commit some grave bodily injury," neither of which were supported by the evidence presented at defendant's trial.

In *State v. Leroux*, 326 N.C. 368, 390 S.E.2d 314, we expressly rejected this argument and concluded that "[p]remeditation and deliberation are not elements of the crime of first-degree murder perpetrated by means of lying in wait, nor is a specific intent to kill." *Id.* at 375, 390 S.E.2d at 320. "Murder perpetrated by lying in wait 'refers to a killing where the assassin has stationed

himself or is lying in ambush for a private attack upon his victim.' " *Id.* (quoting *State v. Allison,* 298 N.C. 135, 147, 257 S.E.2d 417, 425).

The circumstances of this case fall within the definition of murder perpetrated by lying in wait. The evidence presented at trial showed that defendant armed himself with a .357 magnum, went to the victim's home, and hid in a closet within the victim's bedroom. When the victim opened the closet door, defendant fired three shots and killed the victim. This evidence was sufficient to convince a jury beyond a reasonable doubt that defendant was guilty of murder perpetrated by lying in wait. We therefore conclude that the trial court did not err in instructing the jury on this charge.

## V.

[10]    Finally, defendant contends that the trial court erred in refusing to instruct the jury on imperfect self-defense. In support of his contention, defendant asserts that the evidence shows that he went to the victim's home out of fear that the victim's girlfriend would have him killed if he did not kill the victim and that he shot the victim, not to kill him but because he feared the victim.

As noted in *State v. Norman,* 324 N.C. 253, 378 S.E.2d 8 (1989):

> Our law . . . recognizes an *imperfect* right of self-defense in certain circumstances, including, for example, when the defendant is the initial aggressor, but without intent to kill or to seriously injure the decedent, and the decedent escalates the confrontation to a point where it reasonably appears to the defendant to be necessary to kill the decedent to save [himself] from imminent death or great bodily harm.

*Id.* at 259, 378 S.E.2d at 12. A defendant is entitled to an instruction on imperfect self-defense if the evidence, viewed in the light most favorable to him, shows that (1) he instigated the confrontation without murderous intent; (2) he believed it was necessary to kill his adversary in order to save himself from death or great bodily harm; and (3) "defendant's belief was reasonable in that the circumstances as they appeared to him at the time were sufficient to create such a belief in the mind of a person of ordinary firmness." *State v. Bush,* 307 N.C. 152, 158-59, 297 S.E.2d 563, 568 (1982).

Applying the foregoing principles of law to the present case, we find that the evidence, taken in the light most favorable to

defendant, does not entitle defendant to an instruction on imperfect self-defense. The uncontradicted evidence shows that the events leading to the shooting were initiated by defendant with murderous intent. By his own testimony, defendant admitted that he armed himself, went to the victim's house, and hid in the closet for the purpose of killing the victim. Upon cross-examination, defendant testified that he received $300.00 for the killing and that he was supposed to have received $40,000. Defendant's argument that he decided to kill the victim because he feared he would be killed by the victim's girlfriend is of no avail. At best, this evidence supports a finding of duress or coercion, neither of which justify or excuse the intentional killing of another. *See State v. Brock*, 305 N.C. 532, 541, 290 S.E.2d 566, 572 (1982) (" '[T]hough a man may be violently assaulted, and hath no other possible means of escaping death but by killing an innocent person, this fear and force shall not acquit him of murder, for he ought rather to die himself than escape by the murder of an innocent.' " (quoting *State v. Dowell*, 106 N.C. 722, 726, 11 S.E. 525, 526 (1890) )).

We conclude that defendant received a fair trial, free of prejudicial error.

No error.