IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-658

No. COA21-170

Filed 7 December 2021

Mitchell County, Nos. 16 CRS 216-17, 50408, 50413

STATE OF NORTH CAROLINA

v.

TRAVIS WAYNE BOWMAN

Appeal by defendant from judgments entered 14 February 2020 by Judge Gary M. Gavenus in Mitchell County Superior Court. Heard in the Court of Appeals 17 November 2021.

*Attorney General Joshua H. Stein, by Assistant Attorney General Michael T. Henry, for the State.*

*Leslie Rawls for defendant-appellant.*

TYSON, Judge.

¶ 1 Travis Wayne Bowman ("Defendant") appeals from a jury's verdicts finding him guilty of first-degree murder under three separate bases, possession of a firearm by a convicted felon, conspiracy to commit first-degree murder, and first-degree kidnapping. We find no error.

## I. Background

¶ 2 Joshua Emmanuel Buchanan ("Buchanan") had allowed Defendant to borrow

his Ford Mustang vehicle. Defendant was driving the Mustang and was pulled over by law enforcement. Buchanan's Mustang was impounded. Defendant concluded he was stopped by law enforcement because Buchanan had told law enforcement about his trafficking and dealing in methamphetamine. Defendant presumed Buchanan had provided names of individuals involved in methamphetamine distribution to law enforcement. Defendant's girlfriend, Felicia Fox, was present in the Mustang during the traffic stop. She stated that she had no reason to believe Buchanan had provided any names to law enforcement.

¶ 3     Defendant went to a residence located on Valley View Road in Bakersville, which Buchanan shared with his mother, Regina Pittman, and Fox, after Buchanan's Mustang was impounded. Buchanan, Pittman, and Fox all suffered from substance abuse and drug addictions and abused methamphetamine and other controlled substances. Defendant had been selling methamphetamine to Buchanan, Fox, and Pittman for around three months. Defendant brandished a gun and told Fox "I smell death."

¶ 4     Several days after the Mustang was impounded, Defendant took Buchanan and Fox to Kevin Buchanan's ("Kevin") residence where they smoked marijuana with William Guttendorf. Defendant asked Guttendorf and Buchanan to drive to town to buy cigarettes, bottles of Mountain Dew soft drink, and 9mm ammunition. Defendant sent Guttendorf and Buchanan to the store because the license tag on his Jeep was

not valid.

¶ 5     When Guttendorf and Buchanan returned with a couple packs of cigarettes, a bottle of Mountain Dew, and 9mm ammunition, Defendant accused Buchanan of "snitching" about his methamphetamine dealing. Defendant grabbed Buchanan by the collar of his shirt and continued to question Buchanan about "snitching." Defendant fired two rounds from a pistol into the ground near Buchanan's feet.

¶ 6     Defendant had Buchanan to call several of Defendant's family members and asked them to vote on whether Buchanan should live or die. Defendant struck Buchanan and briefly held him in a chokehold.

¶ 7     Defendant had Buchanan, Guttendorf, and Fox to accompany him to Clayton Speaks' residence to transact a methamphetamine sale. While at Speaks' house, Defendant told Speaks that Buchanan had "snitched" and asked if Buchanan should live or die. Speaks told Defendant not to hurt Buchanan.

¶ 8     Defendant left Speaks and drove himself, Buchanan, Guttendorf, and Fox to Matthew Ledford's house. On the way to Matthew's house, Defendant struck Buchanan and stated if he killed Buchanan, he would have to "figure out" what to do with Guttendorf and Fox.

¶ 9     At Matthew's house, Defendant told him that Buchanan had given law enforcement a list of people who were involved in methamphetamine distribution. At some point, Matthew's brother, Chad Ledford, who lived across the street, arrived.

Defendant insisted that the group smoke methamphetamine, which he claimed contained "truth serum." Defendant struck Buchanan demanding to know "why he had snitched." While holding a gun, Defendant filmed Buchanan's "admission" to cooperating with law enforcement on his cell phone. Defendant asked Matthew and Chad what he should do with Buchanan.

¶ 10 Members of the group smoked methamphetamine twice from two bags. After dark, Defendant claimed "people . . . from Georgia" had arrived to "take care of [Buchanan]." Defendant took Buchanan outside the house and a green laser was focused on Buchanan. The source of the green laser was unknown. Defendant asked Buchanan "if he was ready to die." Buchanan tried to hide behind Fox, then attempted to run away. Defendant tackled him and dragged him back towards Matthew's house. Once Buchanan was back under his control, Defendant used his cellphone and recorded him pleading for his life. Buchanan urinated on himself. Defendant did not allow Buchanan to leave, and Defendant, Buchanan, Guttendorf, and Fox spent the night at either Chad or Matthew's house.

¶ 11 The next morning, Defendant, Buchanan, Guttendorf, and Fox used methamphetamine twice. Defendant returned the group back to the home which Buchanan and Fox shared with Pittman. After arrival, Defendant, Buchanan, Guttendorf, Fox, and Pittman used more methamphetamine. In the home, Defendant threatened to keep Buchanan as a hostage unless Buchanan's grandmother gave

Defendant $3,000. Defendant stopped requesting a ransom. He began accusing Buchanan of molesting two unnamed minor girls and Buchanan's sister.

¶ 12    Defendant took the group to one of the Ledford brothers' houses. Defendant showed Buchanan a website showing young girls dancing in their underwear he claimed he had "created . . . to catch people who are being perverted to little girls." Defendant prohibited Buchanan from being able to "walk around by himself."

¶ 13    The group slept for a period before they went to Kevin's house for Guttendorf to retrieve his pickup truck. Defendant, Buchanan, Guttendorf, Fox, and Kevin returned to the home Buchanan, Fox, and Pittman shared. Defendant hit Buchanan a couple of times in the car.

¶ 14    The group began injecting methamphetamine intravenously. Defendant asked Kevin if he had anything to make a "hot shot," a mixture for injection of some kind of poison and methamphetamine, so Defendant could make Buchanan, Fox, and maybe Pittman "kill [them]selves." Kevin found something he called "rat poison" which he loaded into a syringe, which no one injected.

¶ 15    Defendant offered to release Buchanan if he would kill his mother, Pittman. Defendant then changed his mind and revoked the offer to Buchanan. Defendant ordered Fox to beat up Pittman, which she did.

¶ 16    Defendant seized Buchanan by his shirt and hit him in the back of the head with the butt of the gun, while asking Guttendorf if he thought "this shit's a game?"

Defendant ordered Buchanan to sit on the floor, telling him "he wouldn't make it far" if he ran because he "had people staked out." Defendant, Buchanan, Fox, Guttendorf, and Pittman went to Guttendorf's apartment where they got high "a couple of times" on methamphetamine. Defendant, Buchanan, Guttendorf, and Fox spent the night at Guttendorf's apartment and continued to use methamphetamine.

¶ 17    The next morning Defendant, Buchanan, Guttendorf, and Fox used more methamphetamine. Defendant had Guttendorf to take Fox and Pittman back to their home and told him to pick up cigarettes and drinks. Defendant told Guttendorf to return to the apartment so they could "kick [Buchanan's] ass and then let him go."

¶ 18    During the drive to the home, which Pittman, Fox, and Buchanan shared, Guttendorf told Fox "the best thing [Pittman and Fox] could do was just keep their mouths shut." Once Guttendorf dropped Pittman and Fox off, he stopped at a Texaco gas station and purchased two packs of cigarettes and two bottles of soft drink. Guttendorf also stopped to pick up a friend, Melissa Thompson, because he "didn't want to be alone with [Defendant] and [Buchanan]."

¶ 19    Defendant bound Buchanan's hands with duct tape and filmed an eight-minute video on his cell phone of him "interrogating" Buchannan and his "confessing" to various acts of child molestation. The video depicts Buchanan trembling and admitting to all accusations Defendant made.

¶ 20    Defendant pistol whipped and hit Buchanan. Defendant shot Buchanan in the

left shin, shattering his tibia. Another video depicts Buchanan bleeding profusely from the gunshot wound and attempting to use towels to control the bleeding and stabilize his broken leg.

¶ 21        Law enforcement later interviewed Guttendorf and Fox, who were not aware of any evidence that Buchanan had ever molested children. Law enforcement also interviewed the purported victims, which revealed no evidence of child molestation or any other crime warranting further investigation.

¶ 22        Defendant returned Buchanan to the home he shared with Fox and Pittman. When Guttendorf arrived at his apartment he saw a bloody footprint on the front steps. Guttendorf went inside to investigate, while Thompson remained inside the truck. Inside his apartment, Guttendorf found "blood all over the place" in his living room. Defendant called Guttendorf and told him to come to Buchanan's home.

¶ 23        When Guttendorf and Thompson pulled into the driveway, Guttendorf saw Defendant armed with a gun. Buchanan had a "homemade bandage" around his leg. Guttendorf attempted to leave and began to pull the truck out of the driveway. He stopped and put his hands up after Defendant approached the truck with the gun. Guttendorf and Thompson exited the vehicle and entered the house. Defendant showed Guttendorf, Fox, and Thompson the cell phone videos taken at Guttendorf's apartment of Buchanan's "confessions" of child molestation, of Defendant hitting Buchanan in the head, pistol whipping Buchanan, and Defendant shooting Buchanan

in the leg.

¶ 24        At some point Pittman said she was "not gonna have a pedophile in [her] house." Buchanan limped out onto the porch and fell down. Defendant then kicked Buchanan. Guttendorf went inside the home, a few minutes later, Defendant came inside looking for a rope or cord to "make [Buchanan] hang himself." Defendant found a telephone cord and went back outside.

¶ 25        When Guttendorf and Fox went outside a few minutes later, they saw the cord draped over a tree branch and wrapped around Buchanan's neck. Buchanan was almost on his knees and his face was turning blue. Buchanan's feet could touch the ground, if he could have stood up. Fox determined Buchanan "was just [too] tired." Defendant told Fox not to call 911.

¶ 26        The telephone cord broke, and Buchanan fell onto the ground. Buchanan attempted to crawl under Guttendorf's truck, but Defendant "pulled him backout (sic)" and told him "he wasn't going nowhere."

¶ 27        Buchanan limped into the home, but Pittman told Defendant "to get [Buchanan] out of the house and . . . [to] do whatever he needed to do." Defendant forcefully took Buchanan out of the house and threw him down in a patch of weeds in the yard. Buchanan began to scream. Defendant held out the gun and told Thompson, Guttendorf, and Fox they could either "get involved or [they] could be next." Defendant ordered Thompson or Fox to get a large rock and hit Buchanan.

Buchanan was hit at least twice in the head with a large rock approximately ten inches in diameter. Defendant told Buchanan to go "lay somewhere and die." Buchanan stumbled approximately fifteen to twenty feet before collapsing.

¶ 28        Defendant told Fox she could either kill Buchanan or that he would hurt her younger sister and family. Fox initially refused, but Defendant reiterated she would either shoot Buchanan or he was "gonna hurt [them]all." Fox took the gun from Defendant, shot Buchanan once in the side of the head killing him. Fox handed the gun back to Defendant. Defendant acted surprised Fox had shot Buchanan as instructed. Guttendorf testified Defendant remarked: "I can't believe she did it, she f[--]king did it, she shot him."

¶ 29        Defendant told the group "none of [them] could leave" because they were "a part of it now." Defendant instructed Guttendorf and Thompson to move Buchanan's body and directed the others to begin mixing bleach and water to pour over the areas where they had dragged Buchanan's body.

¶ 30        Defendant left and picked up Kevin. When they returned, Buchanan's body was wrapped in a blanket and they left with the body in the bed of Guttendorf's truck. Defendant and Kevin initially left Buchanan's body beside Cane Creek. Defendant later decided this spot was not satisfactory. Defendant had Guttendorf follow him back to retrieve Buchanan's body. Defendant and Guttendorf loaded Buchanan's body in the back of Guttendorf's truck and went to Chad's house to borrow a

wheelbarrow.

¶ 31        Defendant, Fox, Thompson, Kevin and Guttendorf went to Guttendorf's apartment. Defendant retrieved the spent bullet from the couch from when he had shot Buchanan in the leg. Thompson and Guttendorf cleaned up the blood from the floor. Defendant kept the spent bullet "as a trophy." Defendant later put a string through the bullet and "showed" it to people.

¶ 32        Behind a shed at Guttendorf's apartment, Defendant, Guttendorf, and Kevin dug a hole and placed Buchanan's body in it, poured a chemical on the body, filled the hole with dirt, and placed a wooden pallet on top of the ground. Fox cleaned Defendant's Jeep and threw items off an embankment along the road.

¶ 33        Thompson, Guttendorf, Defendant, and Fox separated into two groups. Thompson and Guttendorf did not contact law enforcement because Defendant had "threatened [their] families" and threatened they would "end up like" Buchanan. Defendant and Fox went to Georgia to stay with Defendant's family. Guttendorf testified Buchanan's body was buried around 27 September 2016. Buchanan's sister and cousin reported him missing on 2 October 2016. Law enforcement officers located and exhumed Buchanan's body on 7 October 2016.

¶ 34        Defendant was arrested by the Bartow County (Georgia) Sherriff's Office on 10 October 2016. Defendant was indicted for possession of a firearm by a convicted felon, conspiracy to commit first-degree murder, first-degree kidnapping, and first-degree

murder on 14 November 2016.

¶ 35      Defendant was tried capitally. The jury found Defendant guilty of all charges including first-degree murder on three bases of malice, premeditation, and deliberation; by torture; and, under the felony-murder rule. The jury deadlocked on imposing the death sentence.

¶ 36      Defendant was sentenced to life imprisonment without the possibility of parole for the first-degree murder. Defendant was also sentenced to serve consecutive active sentences of 17 to 30 months for the possession of a firearm by a felon conviction, 207 to 261 months for the conspiracy to commit first-degree murder conviction, and 96 to 128 months for first-degree kidnapping conviction, all to run consecutively to Defendant's life imprisonment without parole. Defendant appeals.

## II.      Jurisdiction

¶ 37      Jurisdiction lies in this Court pursuant to N.C. Gen. Stat. §§ 7A-27(b)(1) and 15A-1444(a) (2019).

## III.      Issues

¶ 38      Defendant argues the trial court erred by denying his request for a jury instruction on voluntary intoxication and by denying his motion to dismiss the first-degree murder charge on the basis of torture.

## IV.      Voluntary Intoxication

¶ 39      Defendant argues the trial court erred by denying his request for a jury

instruction on voluntary intoxication. He asserts his voluntary intoxication of methamphetamine defeated his ability to form the specific intent necessary to support first-degree murder, based on malice, premeditation, and deliberation and the felony-murder rule, and for first-degree kidnapping.

## A. Standard of Review

¶ 40    Arguments "challenging the trial court's decisions regarding jury instructions are reviewed *de novo* by this Court." *State v. Osorio*, 196 N.C. App. 458, 466, 675 S.E.2d 144, 149 (2009). "When determining whether the evidence is sufficient to entitle a defendant to jury instructions on a defense or mitigating factor, courts must consider the evidence in the light most favorable to [the] defendant." *State v. Mash*, 323 N.C. 339, 348, 372 S.E.2d 532, 537 (1988). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Franklin*, 327 N.C. 162, 171, 393 S.E.2d 781, 787 (1990).

## B. Analysis

¶ 41    Over a century ago, our Supreme Court warned "the doctrine [of voluntary intoxication] should be applied with great caution." *State v. Murphy*, 157 N.C. 614, 617-18, 72 S.E. 1075, 1076-77 (1911). A defendant is not entitled to a jury instruction on voluntary intoxication "in every case in which a defendant . . . consum[es] . . . controlled substances." *State v. Baldwin*, 330 N.C. 446, 462, 412 S.E.2d 31, 41 (1992).

¶ 42    A defendant "must produce substantial evidence which would support a

conclusion by the judge that he was so intoxicated that he could not form a deliberate and premeditated intent to kill." *Mash*, 323 N.C. at 346, 372 S.E.2d at 536. "Evidence of mere intoxication . . . is not enough to meet defendant's burden of production." *Id.* Defendant's intent to kill can be inferred by his actions "before, during, and after a crime." *State v. Phillips*, 365 N.C. 103, 141, 711 S.E.2d 122, 149 (2011).

¶ 43 "The evidence must show that at the time of the killing the defendant's mind and reason were so completely intoxicated and overthrown as to render him utterly incapable of forming a deliberate and premeditated purpose to kill." *State v. Strickland*, 321 N.C. 31, 41, 361 S.E.2d 882, 888 (1987) (citation omitted); *see State v. Cureton*, 218 N.C. 491, 495, 11 S.E.2d 469, 471 (1940) ("[T]here must be some evidence tending to show that the defendant's mental processes were so overcome by the excessive use of . . . intoxicants that he had temporarily, at least, lost the capacity to think and plan."). If a defendant does not produce "evidence of intoxication to such degree, the court is not required to charge the jury thereon." *Strickland*, 321 N.C. at 41, 361 S.E.2d at 888 (citation omitted). Voluntary intoxication is only a defense to specific intent crimes. *See State v. Jones*, 300 N.C. 363, 365, 266 S.E.2d 586, 587 (1980).

¶ 44 Defendant argues his specific intent convictions: first-degree murder based on malice, premeditation, and deliberation and the felony-murder rule and first-degree kidnapping must be reversed because he lacked the requisite intent due to

intoxication from methamphetamine. Defendant and the others present before and after Buchanan's killing were smoking and injecting methamphetamine. Defendant asserts the inconsistencies in locations and time spans in the State's witnesses' testimony stem from their use of methamphetamine. Witnesses testified to experiencing symptoms of methamphetamine intoxication: lack of sleep, confusion as to the timeline of events, paranoia, and agitation.

¶ 45        Defendant further asserts Fox's testimony, stating that Defendant that was becoming paranoid and "wigging," during the events mandates the trial court should have issued the voluntary intoxication instruction. Fox defined these phrases as "paranoia in my book would be seeing things and stuff like that. But wigging out is like what I would consider them actually believing that stuff's there."

¶ 46        Contrary to Defendant's assertion, Fox's testimony was only evidence of his intoxication. Defendant has failed to show his "mind and reason were so completely intoxicated and overthrown [from methamphetamine use] as to render him utterly incapable of forming a deliberate and premeditated purpose to kill." *Strickland*, 321 N.C. at 41, 361 S.E.2d at 888 (citation omitted).

¶ 47        Ample evidence of Defendant's specific intent supports the first-degree murder conviction based on malice, premeditation, and deliberation. Defendant's actions showing he "intended for his action[s] to result" in Buchanan's death are that he brandished the gun while declaring he "smell[ed] death," pondered having to "figure

out" what to do with the witnesses if he killed Buchanan, ordered Fox or Thompson to hit Buchanan with a large rock, told Fox to kill Buchanan, orchestrated the disposal of Buchanan's body, retained the spent bullet as a "trophy," fled to Georgia to avoid arrest after the killing, described his actions to family in Georgia, and showed videos he filmed of Buchanan on his cellphone. *Phillips*, 365 N.C. at 141, 711 S.E.2d at 149 (citation omitted).

¶ 48        Ample evidence of Defendant's specific intent to kill supports the first-degree murder conviction based on the felony-murder rule. The underlying crime for the felony-murder rule was first-degree kidnapping. "[T]he actual intent to kill may be present or absent; however, the actual intent to commit the underlying felony is required." *State v. Jones*, 353 N.C. 159, 167, 538 S.E.2d 917, 924 (2000). Defendant's actions show his specific intent to unlawfully restrain or confine over successive days, stating he was doing this in retribution for Buchanan's "snitching," binding Buchanan's hands behind his back, retrieving Buchanan when he tried to escape on foot, offering freedom if Buchanan killed his mother, Pittman, threatening to kill Buchanan by a "hot shot," and orchestrating the attempted hanging of Buchanan.

¶ 49        Defendant possessed and demonstrated the requisite intent to commit the underlying felony, first-degree kidnapping, to support the felony murder conviction. Defendant's argument is without merit and overruled.

## V.   First-Degree Murder by Torture

¶ 50      Defendant argues the trial court erred by denying his motion to dismiss the first-degree murder charge on the basis of torture.

## A. Standard of Review

¶ 51      "Upon defendant's motion for dismissal, the question for the Court is whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense. If so, the motion is properly denied." *State v. Fritsch*, 351 N.C. 373, 378, 526 S.E.2d 451, 455 (citation omitted), *cert. denied*, 531 U.S. 890, 148 L. Ed. 2d 150 (2000).

¶ 52      "In making its determination, the trial court must consider all evidence admitted, whether competent or incompetent, in the light most favorable to the State, giving the State the benefit of every reasonable inference and resolving any contradictions in its favor." *State v. Rose*, 339 N.C. 172, 192, 451 S.E.2d 211, 223 (1994) (citation omitted), *cert. denied*, 515 U.S. 1135, 132 L. Ed. 2d 818 (1995). "The denial of a motion to dismiss for insufficient evidence is a question of law which this Court reviews *de novo*." *State v. Bagley*, 183 N.C. App. 514, 523, 644 S.E.2d 615, 621 (2007) (citation omitted).

## B. Analysis

¶ 53      Defendant asserts the trial court erred by denying his motion to dismiss the first-degree murder on a basis of torture. He argues the State's medical expert, Jerri

Lynn McLemore, MD testified Buchanan died from Fox's gunshot.

¶ 54     "First-degree murder by torture requires the State to prove that the accused intentionally tortured the victim and that such torture was a proximate cause of the victim's death." *State v. Pierce*, 346 N.C. 471, 492, 488 S.E.2d 576, 588 (1997) (citations and internal quotation marks omitted). Torture is defined as "the course of conduct by one or more persons which intentionally inflicts grievous pain and suffering upon another for the purpose of punishment, persuasion, or sadistic pleasure." *State v. Anderson*, 346 N.C. 158, 161, 484 S.E.2d 543, 545 (1997) (citation omitted). Our Supreme Court defines the course of conduct to constitute torture as "the pattern of the same or similar acts, repeated over a period of time, however short, which established that there existed in the mind of the defendant a plan, scheme, system or design to inflict cruel suffering upon another." *Id.* (citation omitted).

¶ 55     The Court upheld a first-degree murder by torture conviction in *State v. Lee*, 348 N.C. 474, 489-90, 501 S.E.2d 334, 344 (1998). In *Lee*, the defendant participated in repeated physical abuse of the victim for a three-day period and then left the residence six days before the victim was killed. *Id.*

¶ 56     Defendant's actions "to inflict cruel suffering" intended to punish Buchanan for purportedly "snitching." Defendant's course of conduct occurred over the period of days while Buchanan was detained, humiliated, beaten, and tortured. *Id.* Contrary to Defendant's assertions, the torture of Buchanan did not just occur when

he shot him in the leg, but began before when he struck Buchanan, polled others to vote if Buchanan should live or die, demanded a "hot shot" be mixed to inject Buchanan, set up and attempted to hang Buchanan by the telephone cord, ordered Buchanan's beating with a rock, and concluded with Defendant ordering Fox, under threats to her and her families' lives, to shoot and kill Buchanan. The trial court properly denied Defendant's motion to dismiss the first-degree murder charge under a theory of torture. Defendant's argument is overruled.

## VI. Conclusion

Defendant failed to show his "mind and reason were so completely intoxicated and overthrown [from methamphetamine use so] as to render him utterly incapable of forming a deliberate and premeditated purpose to kill." *Strickland*, 321 N.C. at 41, 361 S.E.2d at 888 (citation omitted). The trial court properly denied Defendant's request for an instruction on voluntary intoxication.

Viewing the evidence in the light most favorable to the State, sufficient evidence exists to infer Defendant intended to terrorize or injure Buchanan during the period of confinement. Sufficient evidence exists to show acts of "grievous pain and suffering" were inflicted by Defendant for punishment. *Anderson*, 346 N.C. at 161, 484 S.E.2d at 545 (citation omitted).

The trial court did not err in denying Defendant's motion to dismiss the first-degree murder by torture charge. Defendant received a fair trial, free from

prejudicial errors he preserved and argued. We find no error in the jury's verdicts or

in the judgments entered thereon. *It is so ordered.*

NO ERROR.

Judges DIETZ and GRIFFIN concur.