STATE OF NORTH CAROLINA v. JOSEPH DOUGLAS JACKSON

No. 644A86

(Filed 28 July 1987)

1. **Criminal Law § 55.1; Bastards § 5.1— rape—paternity test—G.S. § 8-50.1 not applicable**

     A question of parentage is not central to a charge of rape and N.C.G.S. § 8-50.1 is not applicable.

2. **Criminal Law § 50.1— rape—opinion of geneticist admitted on identity of father of victim's child—no prejudice**

     In a prosecution for first degree rape of a female under the age of thirteen, the testimony of an expert geneticist that defendant was "probably" the father of the victim's child was of no assistance to the trier of fact and should have been excluded on that basis where the testimony was based not only on the paternity index, but also on the witness's assumptions about the degree of defendant's access to the victim. However, there was no reasonable possibility that the jury would have reached a different result had the error not been committed because the jury was made aware of the limitations on the witness's ability to access the evidence of paternity and the jury had before it

defendant's inculpatory statement and the victim's statements that defendant was the father of her child. N.C.G.S. § 8C-1, Rules 702, 704, 403; N.C.G.S. § 15A-1443 (1983).

**3. Criminal Law § 73.5— rape—statements of victim to medical personnel—admissible**

The trial court did not err in a prosecution for the first degree rape of a female under the age of thirteen by allowing medical personnel to testify as to statements made to them by the victim where the statements were made for the purpose of diagnosis and treatment. There was no apparent denial of defendant's Sixth Amendment right to confrontation, even though the witness's statements had been recanted, because the victim testified favorably to defendant and defendant had the opportunity of cross-examination. Moreover, a defendant may always challenge under N.C.G.S. § 8C-1, Rule 403 otherwise admissible evidence which tends to have a prejudicial effect that outweighs its probative value. N.C.G.S. § 8C-1, Rule 803 (4).

**4. Criminal Law § 86.8— child rape victim—opinion of psychiatrist as to victim's truthfulness—no prejudice**

In a prosecution for rape of a female under the age of thirteen, a psychiatrist's testimony that the victim was a truthful person was inadmissible; however, when the psychiatrist testified, the jury had already heard the victim testify that she had not engaged in sexual intercourse with defendant and had also heard testimony that the victim had stated to medical personnel that defendant was the father of her child. In view of the victim's inconsistent statements, it was unlikely that the psychiatrist's single statement would sway the jury to believe the victim's prior statements rather than her trial testimony.

**5. Rape and Allied Offenses § 6.1— first degree rape of child—no instruction on attempted first degree rape—no error**

In a prosecution for first degree rape of a female under the age of thirteen, defendant was not entitled to an instruction on the lesser offense of attempted first degree rape where defendant made no written request for instructions, the record does not reflect a formal oral request, defendant did not set forth the omitted instruction in his record on appeal, there was ample evidence of penetration, and defendant relied on an alibi defense. N.C. Rule of App. Procedure 10(b)(2).

BEFORE *Rousseau, J.,* and a jury at the 26 May 1986 Criminal Session of Superior Court, SURRY County, defendant was convicted of first-degree rape, and judgment sentencing defendant to life imprisonment was entered on 28 May 1986. Defendant appeals pursuant to N.C.G.S. § 7A-27(a). Heard in the Supreme Court 14 May 1987.

*Lacy H. Thornburg, Attorney General, by John F. Maddrey, Assistant Attorney General, for the State.*

*Larry Bowman for defendant-appellant.*

MEYER, Justice.

Defendant was convicted of first-degree rape of a female under the age of thirteen. On appeal, he argues that the trial court erred in (1) allowing an expert to testify that the defendant was probably the father of the victim's child, (2) admitting statements made by the victim to medical personnel, (3) allowing an expert to express an opinion as to the victim's character for truthfulness, and (4) declining to submit the lesser included offense of attempted first-degree rape. We hold that defendant's arguments (2) and (4) lack merit and although defendant's arguments (1) and (3) are meritorious, they do not constitute prejudicial error warranting a new trial.

On 26 July 1985, the victim, an eleven-year-old female, was taken to the emergency room of Northern Surry Hospital. She had been complaining of abdominal pains; upon examination, the emergency room physician determined that the victim was pregnant and in labor. On the morning of 27 July, she gave birth to a premature male infant, who was subsequently transferred to the pediatric intensive care unit of North Carolina Baptist Hospital.

On 29 July 1985, Officer Gray Shelton was contacted by a protective services worker about a possible sexual offense involving defendant, who was the victim's mother's boyfriend, and the victim. He interviewed the victim, her mother, and the defendant. On 8 August 1985, after being apprised of his *Miranda* rights, the defendant stated to Officer Shelton that he had sexual intercourse with the victim on several occasions, beginning in November 1984. On 13 August 1985, while still being treated at Baptist Hospital, the infant died.

At trial, several witnesses testified that the victim had made statements that the defendant was the father of her child. Dr. Tom Vaughn, the treating physician at Northern Surry Hospital, testified that during her hospitalization, the victim—on three or four occasions—stated that the defendant was the father of her child. Dr. Mary Ann Rozakis, the pediatrician who delivered the

infant, testified that the victim stated that her child's father was the defendant.

Dr. Suzanne Kerney, a psychiatrist who first saw the victim on 15 August 1985, also testified that the victim told her that defendant was the father of her child. Additionally, Dr. Kerney testified that the victim expressed concern for defendant's welfare. Over objection, Dr. Kerney was permitted to offer her opinion that the victim "is a truthful person."

The victim testified and denied that defendant was the father of her child. She also denied that she had sexual intercourse with the defendant. She testified that a man named Tom Strickland was the father of her child.

Officer Gray Shelton of the Surry County Sheriff's Department testified that during an interview conducted on 29 July 1985, the victim stated that defendant was the father of her child and that she had been having sexual intercourse with the defendant since "around Christmas." Rita Johnson, a protective services worker who interviewed the victim on 27 July 1985, testified that the victim stated that defendant was the father of her child. The court instructed the jury that the testimony of Gray Shelton and Rita Johnson was to be considered only for purposes of impeaching the testimony of the victim.

Through Dr. Mary McMahan, a geneticist, the State offered the results of human leukocyte antigens (HLA) white blood cell typing and serum protein typing of defendant, the victim, and the victim's child. Dr. McMahan testified that based on the results of the blood typing, the likelihood of defendant's paternity was between 93.4% and 99.91%. She offered her opinion, based upon the test results, that the defendant "probably is the natural father of the child."

Defendant testified and denied that he had engaged in sexual intercourse with the victim. He admitted giving an inculpatory statement to Officer Shelton on 8 August, but testified that he gave the statement so that he would be removed from the victim's home, thus permitting her to return and live with her mother. Defendant also testified that he had been "working tobacco" in Madison, Indiana, during November 1984 and that he returned home to Mount Airy on 14 December 1984.

Defendant also offered the testimony of Annie May Ceasar, Carolyn Love, and Jeanie Rebels, all of whom testified that the victim had stated that defendant was not the father of her child.

I.

Defendant first argues that the court erred in allowing Dr. McMahan to offer her opinion that defendant was probably the father of the child. We find merit in defendant's argument.

Dr. McMahan testified that based on the HLA tissue tests of the victim (mother), defendant, and the child, (1) defendant could not be excluded as the father of the victim's child; (2) the frequency of the defendant's genes in the black population, based upon a probability that a random man in the population would carry his gene markers is 0.0068, or less than 1%; (3) the "likelihood of paternity" is 93.4% at the low range, 99.21% at the median range, and 99.91% at the high range; (4) the "paternity index," expressed as an "odds ratio," is, at the low range, 14 to 1; at the median range, 126.2 to 1; and at the high range, 1,135 to 1; (5) the likelihood of nonpaternity is 6.6% at the weak level, 0.79% at the median level, and 0.09% at the strong level. She then testified as follows:

Q. Based on these tests and these findings, do you have an opinion satisfactory to yourself as to whether or not Joseph Douglas Jackson is the father of [the child].

Mr. Bowman: Objection.

Court: Overruled. Exception #1

Q. You may answer.

A. Yes.

Q. And what is your opinion?

A. I believe that he probably is the natural father of the child.

[1] Defendant argues that although N.C.G.S. § 8-50.1 makes the statistical results of a paternity test admissible, the statute does not permit an expert to offer an opinion as to the probability that a defendant is the father of a child. At the outset, we note that N.C.G.S. § 8-50.1 applies only where "the question of parentage

arises." A question of parentage is not central to a charge of rape. Thus, the commands of N.C.G.S. § 8-50.1 are inapplicable. Instead, we are guided by the North Carolina Rules of Evidence, N.C.G.S. § 8C-1, Rules 701 through 706, relating to the testimony of experts.

The State contends that Dr. McMahan's statement was admissible under our rules governing expert testimony. Specifically, the State relies on: (1) Rule 702, which provides that witnesses may testify, in the form of an opinion, concerning scientific or technical matter if it will assist the trier of fact; (2) Rule 703, which provides that the facts or data upon which an expert bases an opinion may be those either perceived or made known to him; and (3) Rule 704, which authorizes expert testimony in the form of an opinion even if it embraces an ultimate issue.

Before addressing the parties' contentions, it is appropriate to review some of the evidentiary problems associated with the use of HLA tissue tests in the determination of paternity. As a result of scientific advances in the past twenty years, tests which compare the human leukocyte antigens (HLA) of a mother, child, and alleged father are now frequently employed in civil paternity proceedings. *See* Annot. "Weight and Sufficiency of Human Leukocyte Antigen (HLA) Tissue Typing Tests in Paternity Cases," 37 A.L.R. 4th 167 (1985). Likewise, but to a lesser extent, the tests have been used in cases in which the defendant, the alleged father, has been charged with rape of the mother. *E.g., State v. Thompson*, 503 A. 2d 689 (Me. 1986) (defendant charged with incest, gross sexual misconduct, sexual abuse of minor). *See generally* E. Cleary, McCormick on Evidence §§ 205, 211 (3d ed. 1984); I. Ellman and D. Kaye, *Probabilities and Proof: Can HLA and Blood Group Testing Prove Paternity?*, 54 N.Y.U. L. Rev. 1131 (1979); 1A Wigmore, *Evidence* § 165a-165b (Tillers rev. ed. 1983); *Joint AMA-ABA Guidelines: Present Status of Serologic Testing in Problems of Disputed Parentage*, 10 Fam. L. Q. 247 (1976).

Where HLA tests are performed and comparisons made of the genetic markers of the father, mother, and child, experts frequently offer testimony of the putative father's "paternity index." The "paternity index" is an odds ratio representing "how much more likely the alleged father is to be the true father than is an

unrelated random man of the same race." P. Giannelli & E. Imwinkelried, *Scientific Evidence* § 17-9, at 613, quoting R. Armitage and D. Cross, *Paternity Testing in a Judicial Setting*, 39 J. Mo. Bar 477, at 479 (1983). The index may be a number from zero to, theoretically, infinity. The most frequently encountered indices for nonexcluded men range between nineteen and one hundred. R. Peterson, *A Few Things You Should Know About Paternity Tests [But Were Afraid to Ask]*, 22 Santa Clara L.R. 667 (1982).[1]

The "paternity index" is often expressed as a percentage reflecting the odds ratio. Thus, if one has an odds ratio or paternity index of 19 (19 to 1), that is expressed as 95% $(\frac{19}{19 + 1})$. *See* R. Peterson, *A Few Things You Should Know About Paternity Tests [But Were Afraid to Ask]*, 22 Santa Clara L.R. 667, at 683 (1982); P. Giannelli & E. Imwinkelried, *Scientific Evidence* § 17-9, at 618.

In calculating the probability of paternity, the expert applies Bayes theorem, which demonstrates the effect of a new item of evidence on a previously established probability. The new item of evidence is the prior probability of paternity based on nongenetic evidence. The expert employs Bayes theorem to combine the nongenetic probability and the HLA test results to arrive at a probability of paternity.[2] Commentators suggest that the

---

1. The formula for determination of the paternity index is expressed as follows:

$$PI = \frac{X}{Y}$$

where X is the probability that in combination with an egg from the mother, a sperm from a man phenotypically indistinguishable from the defendant would produce a zygote with the child's phenotypes; Y is the probability that in combination with the mother's egg, a sperm from a random, unrelated man would produce the zygote. See P. Giannelli & E. Imwinkelried, *Scientific Evidence* § 17-9 for a thorough explanation of the paternity index.

2. Applying Bayes theorem, the probability of paternity has been expressed as follows:

$$Odds\ (B/T) = LR \times Odds\ (B)$$

where B equals paternity, T signifies the test result, B/T is the probability of paternity revised in light of the test result, and LR is the likelihood ratio (odds ratio). Thus, if the odds are 50/50 (as likely as not), as applied in paternity testing, the

expert should apply varying degrees of prior probability to the established genetic probability reflected in the paternity index. R. Peterson, *A Few Things You Should Know About Paternity Tests [But Were Afraid to Ask]*, 22 Santa Clara L.R. 667 (1982). *See also Plemel v. Walter*, 303 Or. 262, 735 P. 2d 1209 (1987) (discussion of HLA test results as evidence).

In the present case, Dr. McMahan testified that defendant's "paternity index" ranged from 14 to 1 (expressed as a percentage of 93.4%) at the "weak" level, to 126.2 to 1 at the median level (expressed as a percentage of 99.31%), to 1,335 to 1 at the high range (expressed as a percentage of 99.96%). Dr. McMahan testified that the lower range would apply if the jury were to find that the outside evidence was weak. On cross-examination, she stated that the "weak" value was based on a prior probability of 0.1. On cross-examination, she also stated that the genetic evidence could not stand alone, and if there were no access by defendant to the victim, then the prior probability would be 0.000.

[2] We now turn our attention to defendant's specific assignment of error, that the trial court erred in allowing Dr. McMahan to testify that the child born to the victim was probably fathered by the defendant. As noted, we are guided by the North Carolina Rules of Evidence. Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion.

N.C.G.S. § 8C-1, Rule 702 (1986).

Rule 702 sets forth the cornerstone for admissibility of expert testimony. The State argues that under Rule 704, which removes the former prohibition against an expert offering an opinion on an ultimate fact, the testimony of Dr. McMahan was properly admitted. We disagree.

Rule 704 does not eliminate the helpfulness requirement set forth in Rule 702. Although an expert's opinion testimony is not

---

probability will be equal to the likelihood ratio. E. Cleary, McCormick on Evidence § 211, at 659 (3d ed. 1984).

objectionable merely because it embraces an ultimate issue, it must be of assistance to the trier of fact in order to be admissible. 3 D. Louisell & C. Mueller, *Federal Evidence* § 395, at 699 (1979 and Supp. 1986); 1 Brandis on North Carolina Evidence § 126 (Cum. Supp. 1986).

It must be emphasized that an expert's testimony is admissible only where it informs the jury about matters not within the full understanding of lay persons. *E.g., United States v. Webb,* 625 F. 2d 709 (5th Cir. 1980) (defendant charged with shooting at helicopter offered sole defense that he was planting turnips at the time of the offense; expert testimony that defendant lacked propensity to commit such offense excludable as it was not necessary to assist the trier of fact). In the present case, Dr. McMahan's testimony on the use of the paternity index was unquestionably of assistance to the trier of fact. The question presented is whether her conclusion that defendant was "probably" the father of the victim's child assisted the fact finder.

Dr. McMahan's testimony that defendant was "probably" the father of the victim's child was based not only on "scientific, technical or other knowledge," i.e., the paternity index, but also on her own assumptions about the degree of defendant's access to the victim. With Dr. McMahan's testimony concerning the paternity index and the evidence of defendant's access before it, the jury was in as good a position as Dr. McMahan to determine whether defendant was "probably" the father of the victim's child. Therefore, Dr. McMahan's testimony that defendant "probably" was the father of the victim's child was of no assistance to the trier of fact and should have been excluded on that basis.

The State argues that our decision in *State v. Smith,* 315 N.C. 76, 337 S.E. 2d 833 (1985), controls. There, we held that the trial court properly allowed a medical expert to offer his opinion, based upon medical reports, that it was "highly likely" that the victim had engaged in sexual intercourse. *Smith* is factually distinguishable from the present case. In *Smith,* the expert opined that the victim had sexual intercourse, not that she had sexual intercourse with a certain *individual.* In the present case, there was no question but that the victim had sexual intercourse; Dr. McMahan's testimony effectively identified the *individual* with whom she believed the victim had sexual intercourse. In

*Smith*, the expert's opinion was based upon the medical report of one who had personally examined the victim; in the present case, Dr. McMahan's opinion was based entirely on blood test results. We find these distinctions crucial and hold that *Smith* does not control.

Additionally, an expert's opinion may be objectionable because its prejudicial effect outweighs its probative value. N.C. G.S. § 8C-1, Rule 403 (1986). Allowing an expert to offer a personal opinion as to whether a defendant was the father of the victim's child runs the risk of placing before the jury evidence the prejudicial effect of which could outweigh its probative value. The possible prejudice that flows from the use of expert testimony as to probability of paternity was amply illustrated in *Cole v. Cole*, 74 N.C. App. 247, 328 S.E. 2d 446, *aff'd*, 314 N.C. 660, 335 S.E. 2d 897 (1985). There, the results of a blood test indicated that the probability of paternity was 95.98%; however, the evidence also showed that five years prior to the child's birth, defendant had a vasectomy and was therefore infertile. The Court of Appeals reversed a finding that the defendant was the father of the child. This Court affirmed in a per curiam opinion.

In the present case, because the expert's testimony that defendant "probably is the father of the child" was not of assistance to the trier of fact, we find error in its admission. We must now determine whether there is a reasonable possibility that the jury would have reached a different result had the error not been committed. N.C.G.S. § 15A-1443 (1983).

Following Dr. McMahan's testimony that defendant was probably the father of the child, she testified:

But may I say I know none of the outside evidence. I'm basing that entirely on genetic evidence.

Thus, the jury was made aware of the limitations on Dr. McMahan's ability to assess the evidence of paternity. Moreover, the jury had before it the defendant's inculpatory statement and the victim's several statements that defendant was the father of her child. We find no reasonable possibility that the jury would have reached a different result had the challenged opinion testimony not been admitted.

## II.

[3] By his second argument, defendant contends that the trial court erred in allowing medical personnel to testify as to statements made to them by the victim. Defendant concedes that such statements, *when made for the purpose of diagnosis and treatment,* are admissible as an exception to the hearsay rule. N.C.R. Evid. 803(4); *State v. Aguallo,* 318 N.C. 590, 350 S.E. 2d 76 (1986) (child's statement to physician identifying defendant as perpetrator was admissible because pertinent to diagnosis and treatment). Nevertheless, he argues that because the victim later repudiated the statements implicating defendant, these statements are not reliable and are therefore inadmissible under Rule 803(4).

We find that the statements were properly admissible under Rule of Evidence 803(4), as they were made to medical personnel for the purpose of diagnosis and treatment. In response to defendant's contention that trial courts should not rigidly apply the Rule 803(4) exception, we note that under our Rules of Evidence a defendant may always challenge evidence which, although otherwise admissible, tends to have a prejudicial effect that outweighs its probative value. N.C.G.S. § 8C-1, Rule 403 (1986).

Defendant contends that, because the witness' statements had been recanted, in "an unusual sense" he was denied his rights under the confrontation clause of the sixth amendment to the United States Constitution. Inasmuch as the victim testified (in fact, favorably to defendant) and defendant had the opportunity of cross-examination, a denial of his rights under the confrontation clause is not apparent, and we therefore are compelled to reject defendant's argument.

## III.

[4] By his third argument, defendant maintains that the trial court erred in allowing Dr. Suzanne Kerney to testify as follows:

Q. Dr. Kerney, do you have an opinion satisfactory to yourself as to [the victim's] character and reputation for truthfulness?

A. My opinion is that she is a truthful person.

Q. And would you state whether or not that is based on your interviews with her and your studies and so forth with her?

MR. BOWMAN: Objection. Exception #5

COURT: Overruled.

A. Yes, it's based on that.

We have consistently held that expert testimony as to the credibility of a witness is inadmissible. *See* Commentary to N.C.G.S. § 8C-1, Rule 608(a) (1986); *State v. Aguallo*, 318 N.C. 590, 350 S.E. 2d 76 (1986); *State v. Heath*, 316 N.C. 337, 341 S.E. 2d 565 (1986). Dr. Kerney's opinion testimony was clearly of the type we have held inadmissible in *Aguallo* and *Heath*, and it was therefore error to admit it.

We must now determine whether there is a reasonable possibility that had the testimony not been admitted, the outcome of the trial would have been different. N.C.G.S. § 15A-1443(a) (1983). When Dr. Kerney testified as to the victim's character and reputation for truthfulness, the jury had already heard the victim testify that she had not engaged in sexual intercourse with the defendant. The jury had also heard testimony that, at the time her child was born, the victim stated to medical personnel that defendant was the father of her child. Unlike the situations in *Aguallo* and *Heath*, in the present case the State's case did not hinge on the credibility of the witness whom the expert identified as a truthful person. Because the victim's testimony contradicted her earlier statements, it was plain that at some point she had not told the truth. In view of the victim's inconsistent statements, it is unlikely that Dr. Kerney's single statement would sway the jury to believe the victim's prior statements rather than her trial testimony. We therefore find that the error in admitting Dr. Kerney's testimony does not warrant a new trial.

IV.

[5]   In his final argument, the defendant maintains that the court erred in failing to submit the lesser offense of attempted first-degree rape. The trial transcript reflects that, during a discussion of the possible verdicts to be considered by the jury, defense counsel stated that he thought that some of the State's evidence tended "to suggest attempted [rape]." Defense counsel suggested that the testimony was that the victim was penetrated on certain dates and that on other dates actual penetration was not successful, and thus the necessity for the charge depended on which

date the jury chose. There was no written request for instructions, and the record does not reflect a formal oral request. When asked if defense counsel had "anything for the record about the charge," he said, "No, your Honor." The State argues that the defendant failed to comply with Rule 10(b)(2) of the Rules of Appellate Procedure, which provides:

> (2) *Jury Instructions; Findings and Conclusions of Judge.* No party may assign as error any portion of the jury charge *or omission therefrom* unless he objects thereto before the jury retires to consider its verdict, stating distinctly that to which he objects and the grounds of his objection; provided, that opportunity was given to the party to make the objection out of the hearing of the jury, and, on request of any party, out of the presence of the jury. In the record on appeal an exception to instructions given the jury shall identify the portion in question by setting it within brackets or by any other clear means of reference. An exception to the failure to give particular instructions to the jury, or to make a particular finding of fact or conclusion of law which finding or conclusion was not specifically requested of the trial judge, shall identify the *omitted* instruction, finding or conclusion by setting out its substance immediately following the instructions given, or findings or conclusions made. A separate exception shall be set out to the making or *omission* of each finding of fact or conclusion of law which is to be assigned as error.

(Emphases added.)

In the record on appeal, defendant failed to set forth that which he contended was the omitted instruction. Assuming, *arguendo*, that defendant properly set forth an exception to the court's failure to charge on attempted rape and that he preserved it on appeal, this Court is not persuaded that a charge on attempted rape was warranted. In *State v. Smith*, 315 N.C. 76, 337 S.E. 2d 833, this Court held:

> Where there is evidence of some penetration sufficient to support a conviction of rape and the defendant denies having any sexual relations with the victim, the defendant is not entitled to a charge of attempted rape.

*Id.* at 102, 337 S.E. 2d at 850.

In the present case, there was ample evidence of penetration. Defendant relied on an alibi defense, thus denying having had any form of sexual relations with the victim. Therefore, he is not entitled to an instruction on attempted rape.

For the reasons set forth, we find that the defendant received a fair trial, free from prejudicial error.

No error.