STATE OF NORTH CAROLINA v. WESLEY THOMAS HARRIS

No. 435A92

(Filed 3 November 1994)

## 1. Evidence and Witnesses § 963 (NCI4th)— hearsay— defendant's statements to psychiatrist—trial preparation—medical diagnosis exception inapplicable

Defendant's statements to a psychiatrist were made in preparation for his murder trial and were thus not admissible under the medical diagnosis or treatment exception to the hearsay rule set forth in N.C.G.S. § 8C-1, Rule 803(4) where the psychiatrist saw defendant less than two months before trial and nine months after the killing; defense counsel arranged defendant's interview by the psychiatrist; there was no evidence that the psychiatrist planned or proposed any course of treatment; and the psychiatrist's contact with defendant prior to trial was limited to one occasion while defendant was in jail.

**Am Jur 2d, Evidence § 867.**

**Admissibility of statements made for purposes of medical diagnosis or treatment as hearsay exception under Rule 803(4) of the Federal Rules of Evidence. 55 ALR Fed 789.**

## 2. Evidence and Witnesses § 1025 (NCI4th)— defendant's statements to psychiatrist—inadmissibility as statements against penal interest

Defendant's statements to a psychiatrist were not admissible as statements against penal interest pursuant to N.C.G.S. § 8C-1, Rule 804(b)(3), even if defendant may assert his own unavailability, because they were not so incriminating "that a reasonable man in his position would not have made the statement[s] unless he believed [them] to be true" where the incriminating statements defendant made to the psychiatrist were similar to statements he had already made to the police; the only additional incriminating information in the statements served only to reduce defendant's potential criminal liability; and the bulk of defendant's statements to the psychiatrist were exculpatory.

**Am Jur 2d, Evidence §§ 789 et seq.**

STATE v. HARRIS

[338 N.C. 211 (1994)]

**What constitutes statement against interest admissible under Rule 804(b)(3) of Federal Rules of Evidence. 34 ALR Fed 412.**

**3. Evidence and Witnesses § 2241 (NCI4th)— defendant's statements to psychiatrist—basis for expert opinion— exclusion not prejudicial error**

Assuming, arguendo, that statements defendant made to a psychiatrist should have been admitted in defendant's trial for first-degree murder, armed robbery and conspiracy to murder to show the basis for the psychiatrist's expert opinion regarding defendant's mental disorders, defendant was not prejudiced by the exclusion of those statements where the psychiatrist testified that defendant suffered from chronic and acute abuse of marijuana, cocaine and alcohol which would have impaired his ability to form the specific intent to kill; the jury refused to find defendant guilty of first-degree murder based on premeditation and deliberation but found him guilty based on lying in wait and on the felony of armed robbery; there is no reasonable possibility that defendant's convictions for armed robbery and conspiracy were affected by the exclusion of defendant's statements as support for the psychiatrist's diagnosis since a fair reading of the record reveals that his testimony addressed only the crime of murder; and even if the psychiatrist's testimony were construed to indicate that defendant could not form the intent required for armed robbery and could not agree to commit certain acts, the record indicates that defendant's statements to the psychiatrist were of only minimal significance to the psychiatrist's opinions.

**Am Jur 2d, Expert and Opinion Evidence §§ 228 et seq.**

**4. Evidence and Witnesses § 84 (NCI4th)— murder-robbery— evidence irrelevant to facts in issue**

In this prosecution for first-degree murder and armed robbery, the trial court did not err in sustaining the State's objections to questions concerning whether defendant's father abandoned him, when defendant's drug use began, the nature of the area where the murder-robbery occurred, and the location of the victim's husband, the reasons he was in jail, and his relationship with the codefendant since the evidence sought to be elicited was not material to any issue in the case; the psychiatrist who testified that defendant suffered from chronic and acute intoxication of cocaine, marijuana and alcohol on the day of the crimes did not

state that when defendant began using drugs affected his diagnoses; and defendant was permitted to elicit from another witness that the area was known for drug activity.

**Am Jur 2d, Evidence §§ 307 et seq.**

5. **Evidence and Witnesses § 2302 (NCI4th)— ability to premeditate and deliberate—expert opinion properly excluded**

Opinion testimony by a psychiatrist that defendant could not premeditate and deliberate was properly excluded because it relates to a legal standard.

**Am Jur 2d, Expert and Opinion Evidence §§ 193, 194, 362, 363.**

**Admissibility of expert testimony as to whether accused had specific intent necessary for conviction. 16 ALR4th 666.**

6. **Evidence and Witnesses § 1422 (NCI4th)— rifle, ammunition and other items found at defendant's apartment—failure to link to crimes charged—admission as harmless error**

Assuming arguendo that the trial court in a murder-robbery trial erred by admitting walkie-talkies, a crowbar, a Redfield scope, clips, ammunition, and a .22 caliber bolt-action rifle found in a duffel bag in defendant's apartment because these items were not linked to the crimes charged, there is no reasonable possibility that the admission of these items affected the outcome of the trial in light of the State's minimal reference to these items at trial and the State's other evidence, including defendant's inculpatory statement and firearms found in defendant's apartment which were linked to the crimes. N.C.G.S. § 15A-1443(b).

**Am Jur 2d, Evidence §§ 307 et seq.**

7. **Jury § 80 (NCI4th)— excusal of jurors for cause—absence of prejudice to defendant**

Assuming arguendo that the trial court erred by excusing for cause a prospective juror who stated that he had negative feelings toward the district attorney but could apply the law fairly, a juror who indicated that he knew defendant but could give the State and defendant a fair trial, and a juror who stated that he did not want to spend the time necessary for a first-degree murder trial, defendant failed to show that he was prejudiced thereby since a

defendant is not entitled to any particular juror, and defendant evidenced his satisfaction with the empaneled jury by failing to exhaust his peremptory challenges.

**Am Jur 2d, Jury §§ 195 et seq.**

8. **Jury § 223 (NCI4th)— death penalty views—improper excusal—no prejudice to defendant sentenced to life**

Since defendant was not sentenced to death, he was not harmed by any improper exclusion of jurors on the basis of their death penalty views.

**Am Jur 2d, Jury §§ 289, 290.**

**Comment Note.—Beliefs regarding capital punishment as disqualifying juror in capital case—post-*Witherspoon* cases. 39 ALR3d 550.**

9. **Jury § 232 (NCI4th)— death qualification of jury— constitutionality**

The practice of death qualifying the jury did not violate defendant's right to a fair trial.

**Am Jur 2d, Jury §§ 289, 290.**

**Comment Note.—Beliefs regarding capital punishment as disqualifying juror in capital case—post-*Witherspoon* cases. 39 ALR3d 550.**

10. **Criminal Law § 427 (NCI4th)— closing argument—opening statement facts unsupported by evidence—no comment on defendant's failure to testify**

Where the evidence did not support facts contained in the opening statements of defendant's counsel, the district attorney's closing argument question "What witness said that?" after referring to certain assertions in the opening statements was a fair response to the opening statements and did not constitute an improper comment on defendant's failure to testify. The defendant's erroneous expectations of the admissibility of certain evidence did not deprive the State of the ability to point out that facts alluded to in opening statements were not supported by the evidence introduced at trial.

**Am Jur 2d, Trial §§ 577 et seq.**

**Violation of federal constitutional rule *(Griffin v. California)* prohibiting adverse comment by prosecutor or**

court upon accused's failure to testify, as constituting reversible or harmless error. 24 ALR3d 1093.

11. **Criminal Law § 433 (NCI4th)— closing argument—references to defendant as "cold-blooded murderer" and "doper"**

It was not improper for the prosecutor to refer to defendant in closing arguments as a "cold-blooded murderer" in a trial for first-degree murder involving a calculated armed robbery and an unprovoked killing. Similarly, where evidence of the State and defendant showed that defendant had a history of drug abuse, the prosecutor's reference to defendant as a "doper," while colloquial, was an accurate term describing the defendant as portrayed by the evidence.

**Am Jur 2d, Trial §§ 681, 682.**

**Negative characterization or description of defendant, by prosecutor during summation of criminal trial, as ground for reversal, new trial, or mistrial—modern cases. 88 ALR4th 8.**

12. **Criminal Law § 450 (NCI4th)— closing argument—shooting victim down "just like a dog"**

The prosecutor's statement characterizing defendant's act of killing the victim as "shooting her down just like a dog" did not compare defendant to an animal and was not improper.

**Am Jur 2d, Trial §§ 681, 682.**

**Negative characterization or description of defendant, by prosecutor during summation of criminal trial, as ground for reversal, new trial, or mistrial—modern cases. 88 ALR4th 8.**

13. **Criminal Law § 468 (NCI4th)— closing argument—defense strategy as "ingenuity of counsel"**

The prosecutor's reference in his closing argument to defense strategy as "ingenuity of counsel" was not so grossly improper as to require the trial judge to intervene *ex mero motu*.

**Am Jur 2d, Trial §§ 683 et seq.**

**Supreme Court's views as to what courtroom statements made by prosecuting attorney during criminal trial violate due process or constitute denial of fair trial. 40 L. Ed. 2d 886.**

Appeal of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment entered by Sumner, J., at the 24 February 1992 Criminal Session of Superior Court, Pitt County, upon a jury verdict of guilty of murder in the first degree. Defendant's motion to bypass the Court of Appeals was allowed 29 December 1992. Heard in the Supreme Court 16 September 1993.

*Michael F. Easley, Attorney General, by William B. Crumpler, Associate Attorney General, for the State.*

*Ernest L. Conner, Jr., for defendant-appellant.*

EXUM, Chief Justice.

Defendant was indicted for the following crimes committed against Dorothy Mae Smith: murder, robbery with a dangerous weapon, conspiracy to commit murder, and conspiracy to commit robbery. On 12 March 1992 he was convicted of first-degree murder on theories of felony murder and lying in wait, armed robbery, conspiracy to commit murder, and conspiracy to commit armed robbery. On 17 March 1992 the jury recommended life imprisonment for the murder conviction. The trial judge sentenced defendant to life imprisonment for murder, forty years for robbery with a dangerous weapon, and thirty years for conspiracy to commit murder; he arrested judgment on the conviction for conspiracy to commit armed robbery. He ordered all sentences to run consecutively.

I.

The State introduced evidence tending to show as follows:

William Brown, brother to Dorothy Mae Smith, worked with Smith on the evening of 3 April 1991 at the convenience store she owned and operated. She closed the store around 10:20 p.m. and left with a money box and a gun, among other items. The box contained checks and about $4000 in cash. She put the box and gun into a white bag and left in her car. Brown followed her to her home which was near the store. After watching Smith pull into her yard, Brown drove off. According to Brown, Smith's husband was in jail at the time.

Lonnie Daniels was a neighbor of Smith. At around 10:30 p.m. on 3 April 1991 he heard five noises that sounded like gunshots. They seemed to come from the direction of Smith's backyard. He went outside his house to look around and noticed Smith's truck in the driveway. With a friend, Daniels went closer to the home and saw Smith

lying on the ground with blood at the back of her head. She was not moving. His friend called the 911 emergency number. He waited until Deputy Sheriff Thomas Wilson arrived.

Deputy Sheriff Thomas Wilson received a call at about 10:41 p.m. on 3 April 1991. He arrived at Smith's residence within seven minutes and saw Daniels and his friend. Daniels led Wilson to the back of Smith's house, where the driveway ends. Wilson observed Smith's body on the ground. Her keys were nearby and there was blood near her head. The rescue squad soon arrived and Smith was declared dead.

Sergeant Billy Tripp arrived at the scene to investigate. He found four .22-caliber fired casings at the edge of the driveway near a bush. Deputy M.H. Kraft arrived at the scene and found a .32-caliber bullet behind an air conditioning unit and a .22-caliber bullet in front of the unit.

On 4 April 1991 police received a tip that David Ward was involved with Smith's death. They arrested and interrogated Ward later that day. Deputy Kraft was present during the interrogation. Ward stated that he and defendant surveilled the store that Smith operated and waited in the bushes behind her house. Smith left her car and approached her home. According to Ward, defendant shot Smith. Smith screamed, and Ward shot her with a .22-caliber rifle. Ward then shot several times in the air, after which he and defendant grabbed the money box and bag and ran. They took the money and put the box and bag in a ditch beside a road.

Around 3:00 p.m. Deputy Kraft was driving with Ward in Kraft's car when Ward pointed out defendant driving in the opposite direction. Kraft turned around and pulled defendant over. Defendant and two others were in the car. Defendant consented to a search of his vehicle, which revealed $1004.50 and marijuana.

After defendant was arrested, he stated that on the night of 3 April 1991 he picked up Ward at Ward's mother's house and they proceeded to Smith's store. They then drove to Smith's house, where they parked on the road across from the house. They went to Smith's house and hid in some bushes next to the driveway. Smith then drove into the driveway and pulled to the back of the house. She got out of her vehicle, removed a white plastic bag from the passenger side and went to the other side of the truck to get the cash box. When she started toward the door of her house, Ward rose and started shooting

with the rifle. Defendant admitted that he had a .32-caliber pistol and that he shot one time. Defendant then got the white bag at Ward's instruction and they left. They divided the money and put the money box and plastic bag in a ditch. Defendant took Ward to Ward's mother's house, and Ward instructed defendant to keep the rifle at his home until later in the week. Before being pulled over by Officer Kraft, defendant jettisoned a large sum of money from the car.

Kraft then went to defendant's apartment with a search warrant. While searching defendant's apartment, officers found a green duffel bag in a closet in the ceiling. The bag contained a Ruger .22-caliber semi-automatic rifle, a .32-caliber semi-automatic pistol and a single-shot, bolt action .22-caliber rifle. It also contained other items such as ammunition clips, ammunition, a holster, a Redfield telescopic scope that fits on a rifle, walkie-talkies, bank bags and a crowbar.

A white plastic bag containing a metal box was later found by a passerby near the place where defendant was arrested. The bag also contained some checks. There was no money in the bag or box. Officers also found in this same general area $2429 and a bank bag.

Dr. M.G.F. Gilliland observed Smith's body that night and later performed an autopsy. In Gilliland's opinion, Smith died of five gunshot wounds to the head, trunk and arm. Gilliland could not determine the type of ammunition that caused the wounds. While examining Smith, Gilliland found a small caliber bullet in Smith's clothing.

Ronald Marrs, a special agent with the State Bureau of Investigation, and an expert on firearms and tool mark identification, testified that the .32-caliber bullet found behind the air conditioner had been fired from the .32-caliber semi-automatic pistol found in defendant's apartment. The four cartridge casings found at the scene were fired by the Ruger semi-automatic .22-caliber rifle. He determined that the .22-caliber single-shot, bolt-action rifle found at defendant's apartment did not fire any bullets or cartridge cases found at the crime scene.

Defendant did not testify, but he offered evidence which tended to show as follows:

Defendant used drugs on 3 April 1993. Larry Perry was with defendant in the late afternoon and early evening of that day and saw defendant consume crack cocaine. Defendant's eyes were glassy, he was edgy, and he looked as though he were in the "twilight zone."

Theresa Godley, engaged to defendant and mother of his child, saw defendant between 8:15 p.m. and 8:30 p.m. He was pacing and shaky; his eyes were red; and he didn't say much. Gail Harris, defendant's cousin, saw defendant around 11:00 p.m. He did not respond to Harris's statements. Harris had seen defendant use alcohol and marijuana earlier in the afternoon. Carolyn Whichard, a friend of defendant, saw him around midnight when he arrived at her house. He appeared "spaced out"; his eyes were blurry, and he looked as though his mind were elsewhere. He stayed there that night.

Dr. Thomas Brown, a psychiatrist, testified that defendant had a passive, dependent personality and was dependent on alcohol, cocaine and marijuana. Dr. Brown interviewed defendant for three hours and reviewed defendant's medical records and school records. In Dr. Brown's opinion, defendant could not form the specific intent to kill because of his chronic and acute alcohol, cocaine and marijuana dependencies.

A private investigator testified that the area near Smith's convenience store has a reputation for drug transactions.

II.

A.

Defendant first argues that the trial court erred in sustaining objections to his questions of Dr. Brown aimed at eliciting statements made by defendant to Dr. Brown during his psychiatric interview.

Dr. Brown interviewed defendant in the Pitt County jail on 4 January 1992. Based on that interview as well as information contained in records and reports, Dr. Brown diagnosed defendant as having a passive dependent personality, which is characterized by an extreme sensitivity to the views of others and results in one's being "pliable" or "spineless." He also diagnosed defendant as suffering from dependency on alcohol, cocaine, and marijuana. Chronic use of these substances causes a "decrease in intellectual ability," or a "change in the sharpness of mental functioning, the ability to understand, plan, and be mentally quick." They "affect the areas of higher brain functioning" and result in a decreased capacity to "get the big picture." Based on defendant's chronic and acute substance abuse, Dr. Brown was of the opinion that defendant could not have formed the specific intent to kill at the time of the killing.

Dr. Brown stated that defendant's statements to him, including those regarding the events of 3 April 1991, were necessary to his diagnoses. The trial court sustained the State's objections to questions regarding what defendant told Dr. Brown during their interview.

Defendant then made an offer of proof in which Dr. Brown revealed that defendant told him the following: Ward proposed that he and defendant break or enter Smith's house to steal cocaine or money that might be there. Defendant believed that there was a large cache of cocaine or a large amount of money in Smith's house. Before the killing defendant consumed more than a pint of wine, possibly as much as a liter, smoked $125 worth of cocaine, and smoked five or six marijuana cigarettes. He went to Smith's house with the intent to steal money or cocaine. He was frightened because he believed that there were vicious Rottweiler dogs inside to protect the cocaine or money. He thought that only the dogs might get shot. Before Smith arrived he developed second thoughts about the theft. Before he could withdraw from the crime, however, Smith arrived; and Ward said to defendant, "It's too late. We can't leave now." When Smith left her car Ward shot her. Defendant was surprised when Ward shot Smith. Ward then said, "You're going to shoot now, too; you're going to do it." Defendant then shot without aiming because he felt that Ward might shoot him if he didn't shoot. Afterward defendant expressed his surprise to Ward by stating, "What the heck were you doing?" and "Why did you ever do that?"

Dr. Brown explained that defendant's statements were necessary to his diagnoses because they reflected that defendant was preoccupied with obtaining cocaine, which is consistent with chronic substance abuse. Defendant's disregard for the danger posed by the Rottweilers he thought were inside is also typical of those with chronic and acute intoxication since they "lack capacity to appreciate . . . dangerous consequences." Dr. Brown explained:

> Because you can see in the pattern of his thinking that evening at that time, the clear evidence of the mental impairment from the chronic and acute drug usage and the parsing out of the pathological patterns of thinking, the differential susceptibility to suggestion and urging of another, the particular kind of poor, faulty judgment exercised by someone with far advanced addiction, that all of that medical information distinguishes him from many other people that don't have those medical conditions.

Defendant contends that statements he made to Dr. Brown should have been admitted as substantive evidence since they were made for the purpose of medical diagnosis and since they were statements against interest; he also contends they should have been admitted as corroborative evidence since they formed part of the basis of Dr. Brown's opinion. We deal with these arguments in turn.

1.

[1] Rule of Evidence 803(4) provides that the following statements are not excluded by the hearsay rule:

> Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

N.C.G.S. § 8C-1, Rule 803(4) (1992).

This hearsay exception permits witnesses to testify to statements made for the purpose of medical treatment or diagnosis. *State v. Jackson*, 320 N.C. 452, 462, 358 S.E.2d 679, 684 (1987); *State v. Aguallo*, 318 N.C. 590, 595, 350 S.E.2d 76, 79 (1986). This exception applies to statements made to psychiatrists and psychologists. *See, e.g., Jackson*, 320 N.C. at 462, 358 S.E.2d at 684; *State v. Bullock*, 320 N.C. 780, 782, 360 S.E.2d 689, 690 (1987).

This hearsay exception is founded on the premise that a statement made for the purpose of medical diagnosis or treatment is inherently trustworthy. *See* Rule 803 commentary (basis for exception is "patient's strong motivation to be truthful"). We have recognized, however, that statements made to a psychiatrist for the purpose of preparing for trial lack the trustworthiness generally attributed to statements made for medical diagnosis or treatment. *State v. Bock*, 288 N.C. 145, 162-63, 217 S.E.2d 513, 524 (1975) (statements made two days before trial were made "for the purpose of [the psychiatrist] testifying as a witness for defendant" and hence unreliable), *judgment vacated*, 428 U.S. 903, 49 L. Ed. 2d 1209 (1976), *in light of Woodson v. North Carolina*, 428 U.S. 280, 49 L. Ed. 2d 944 (1976); *see also State v. Stafford*, 317 N.C. 568, 572-73, 346 S.E.2d 463, 466-68 (1986) (statements made three days before trial were made to establish State's theory, not for diagnosis or treatment and hence inadmissible); *State v. Smith*, 315 N.C. 76, 86, 337 S.E.2d 833, 840 (1985) (statements to Rape Task Force volunteer inadmissible under Rule 803(4)); *compare*

*State v. Aguallo*, 318 N.C. at 595, 350 S.E.2d at 79 (holding statements to doctor admissible where visit to doctor "was primarily for diagnosis and treatment" and not for litigation). Thus, where statements are made not for the purpose of diagnosis or treatment alone, but rather for diagnosis for the purpose of preparing for trial, they are not admissible under Rule 803(4).

Dr. Brown stated on direct examination, "You [defense counsel] asked me to look at him with regard to any medical diagnoses that might be present in his case—actually Mr. Connor had by phone, and had explained that there was concern that—." At that time the court sustained the prosecutor's objection. On cross-examination it was revealed that Dr. Brown saw defendant on 4 January 1992 for three and one-half hours and that he had not seen him since that time.

Based on this evidence we find that defendant's statements to Dr. Brown on 4 January 1992 were made for the purpose of preparing for litigation. Dr. Brown saw defendant less than two months before trial and nine months after the killing. The proximity of the statements to the trial tends to indicate that the statements were made to prepare for trial. The fact that defense counsel arranged the interview between defendant and Dr. Brown also indicates that the purpose of the interview was to prepare for litigation. While this factor is not dispositive, *State v. Jones*, 89 N.C. App. 584, 593, 367 S.E.2d 139, 144 (1988), it militates against admitting the statements. Also, while Dr. Brown diagnosed defendant's mental condition, there was no evidence that he planned or proposed any course of treatment. Similarly, Dr. Brown's contact with defendant prior to trial was limited to one occasion while defendant was in jail; this tends to show that Dr. Brown did not intend to treat defendant.

Since defendant's statements to Dr. Brown were made in preparation for trial, they were not admissible under the hearsay exception contained in Rule 803(4).

2.

[2] Defendant next argues that his statements were admissible under Rule 804(b)(3), which makes admissible:

A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to

STATE v. HARRIS

[338 N.C. 211 (1994)]

be true. A statement tending to expose the declarant to criminal liability is not admissible in a criminal case unless corroborating circumstances clearly indicate the trustworthiness of the statement.

N.C.G.S. § 8C-1, Rule 804(b)(3) (1992). This hearsay exception applies only where the declarant is "unavailable." N.C.G.S. § 8C-1, Rule 804 (1992). Initially, we note that we are not convinced that a defendant may challenge his own availability.[1] In any event, we hold that defendant's statements to Dr. Brown did not "so tend[] to subject him to civil or criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true."

First, the incriminating statements defendant made to Dr. Brown were quite similar to statements he had already made to police. In his statement to Officer Harris, defendant said that he picked up Ward and they rode to Smith's store. Upon seeing Smith in her store they drove to Smith's house and parked across the street. They then hid in some bushes next to Smith's driveway and waited for her to come home. When Smith got out of her truck Ward began shooting and defendant shot one time. At Ward's instruction defendant obtained the box and bag containing the money.

The only additional incriminating information in the statements to Dr. Brown was that defendant and Ward initially intended to break and enter Smith's house to obtain cocaine or money. Under the version of events defendant related to Dr. Brown, however, this was the only crime originally intended. Were this statement true, it would tend to disprove: that defendant intended to kill Smith, that defendant intended to rob Smith, and that defendant conspired to commit

---

1. Rule 804(a) provides that:

> A declarant is not unavailable as a witness if his exemption, refusal, claim of lack of memory, inability, or absence is due to the procurement or wrongdoing of the proponent of his statement for the purpose of preventing the witness from attending or testifying.

Where a defendant does not testify, it seems that his "refusal . . . or absence is due to [his] procurement . . . for the purpose of preventing [his] . . . testifying." That a defendant cannot assert his own unavailability is consistent with the principle that "[t]o take advantage of the hearsay exceptions under Rule 804(b), the proponent must, under Rule 804(a)(5), show at least a good-faith, genuine, and bona fide effort to procure the declarant's attendance . . . ." 32B Am. Jur. 2d *Federal Rules of Evidence* § 265 (1982). *See also United States v. Evans*, 635 F.2d 1124, 1126 n.1 (4th Cir. 1980), *cert. denied*, 452 U.S. 943, 69 L. Ed. 2d 958 (1981) (expressing doubt that defendant may assert his own unavailability).

these crimes. Thus, defendant's statement to Dr. Brown relating to breaking and entering served only to reduce his potential criminal liability.

Moreover, the bulk of defendant's statements to Dr. Brown were exculpatory. The account of 3 April 1991 that defendant related to Dr. Brown showed that defendant had consumed an enormous amount of alcohol, cocaine and marijuana that day. Defendant told Dr. Brown that he and Ward had weapons only to protect themselves from vicious dogs inside Smith's house. He also told Dr. Brown that he was surprised by Smith's arrival, that he wanted to back out of the crime, that Ward told him to remain and that Ward told him to fire his rifle.

In light of the exculpatory nature of defendant's statements to Dr. Brown and the other evidence against defendant, including his statements to police, the statements to Dr. Brown were not so incriminating "that a reasonable man in his position would not have made the statement[s] unless he believed [them] to be true."

3.

[3]  Defendant last argues that the statements he made to Dr. Brown should have been admitted to support Dr. Brown's expert opinion regarding defendant's mental disorders. Assuming arguendo, that exclusion of this evidence for this purpose was error, defendant has not shown prejudice.

Dr. Brown testified that on 3 April 1991 defendant suffered from chronic and acute abuse of marijuana, cocaine and alcohol which would have impaired his ability to form the specific intent to kill. The jury, however, refused to find defendant guilty of first-degree murder based on premeditation and deliberation. Instead the jury found defendant guilty of first-degree murder based on lying in wait and on the felony of armed robbery. Dr. Brown's diagnosis could have had no effect on the finding of first-degree murder by lying in wait since a defense of lack of mental capacity does not apply to lying in wait. *State v. Baldwin*, 330 N.C. 446, 461-62, 412 S.E.2d 31, 40-41 (1992).

Also, there is no reasonable possibility that defendant's convictions for armed robbery and conspiracy were affected by the exclusion of defendant's statements offered to support Dr. Brown's diagnoses.[2] A fair reading of the record reveals that Dr. Brown's testi-

2. We also note that had defendant introduced his statements to Dr. Brown to corroborate Dr. Brown's opinions, the State could have used them as substantive evidence under Rule 801(d), relating to admissions. The statements show that defendant and

mony addressed only the crime of murder, focusing on whether defendant could have formed the intent to kill, whether defendant could premeditate and deliberate, and whether defendant could act with malice.

Even if Dr. Brown's testimony were construed to indicate that defendant could not form the intent required for armed robbery and could not agree to commit certain acts, the record reflects that defendant's statements to Dr. Brown were of only minimal significance to Dr. Brown's opinions. Defendant's statements to Dr. Brown were relevant only in that they showed that defendant's thought process at the time of the murder was consistent with chronic and acute substance abuse. With regard to chronic substance abuse, however, Dr. Brown testified that the most important consideration is a "detailed history . . . [of the patient's] life predating active drug use" and the patient's activity over the most recent few years. With regard to acute substance abuse, there was ample evidence, other than defendant's thought processes on the day of the murder, that he had consumed large quantities of intoxicating substances. Thus, to the extent that defendant's thought processes as reflected by his statements to Dr. Brown were relevant to establish defendant's chronic and acute substance abuse, their significance was minimal as there was other substantial evidence that was probative of these impairing conditions.

We are also persuaded that Dr. Brown's opinions were not without effect, notwithstanding the exclusion of defendant's statements underlying those opinions, as the jury found defendant not guilty of murder by premeditation and deliberation even though he admitted to police that he went to Smith's house with a loaded pistol, waited for her to arrive, fired one time, and fled with Smith's money.

To conclude, defendant's statements to Dr. Brown were made primarily for litigation and were thus not admissible under Rule 803(4). As they were not against his penal interest they were not admissible under Rule 804(3). And since their exclusion as the basis for Dr. Brown's opinions did not prejudice defendant, their exclusion does not amount to reversible error.

Ward went to Smith's house with the intent to steal money or cocaine. That defendant intended to steal cocaine or money from Smith's house is a strong indication that he had the capacity to commit armed robbery. Similarly, that he intended to do so with Ward is a strong indication that he had the ability to form an agreement to commit armed robbery and murder.

B.

**[4,5]**  Defendant next argues that the trial court erred in sustaining the State's objections to questions concerning: whether defendant's father abandoned him; defendant's drug use, including when it began and whether it was regular; whether Dr. Brown thought defendant could premeditate and deliberate; the nature of the area where the crime occurred; and the location of Smith's husband, the reasons he was in jail, and his relationship with Ward. This evidence, however, is either immaterial, inadmissible on other grounds, or its exclusion could not have prejudiced defendant in light of other evidence adduced.

Whether the defendant was abandoned by his father was not material to any issue in the case. Dr. Brown did not testify that defendant's relationship with his father affected his diagnoses of defendant. Regarding questions concerning defendant's drug use, Dr. Brown was permitted to testify that defendant suffered from chronic and acute intoxication of cocaine, marijuana and alcohol on the day of the offense. Further, several of defendant's acquaintances testified to his use of drugs on the day of the offense and to his intoxicated appearance. Dr. Brown did not state that when defendant began using drugs affected his diagnoses; in fact, Dr. Brown stressed the importance of the years immediately preceding the murder to his diagnoses. Regarding the character of the neighborhood, defendant was permitted to elicit from Ronald Clark that the area was known for drug activity; defendant has not shown how the dangerousness of the area near the convenience store was material to any issue in the case. Nor has defendant shown the materiality of the whereabouts of Smith's husband or his relationship with Ward. As to Dr. Brown's opinion that defendant could not premeditate and deliberate, such opinion testimony is improper as it relates to a legal standard. *State v. Rose*, 323 N.C. 455, 459, 373 S.E.2d 426, 429 (1988).

C.

**[6]**  Defendant next argues that the trial court erred by denying his motion *in limine* to prevent the State from introducing or making reference to certain items found in the duffel bag in his apartment. Specifically, the defendant sought to exclude evidence relating to walkie-talkies, a crowbar, a Redfield scope, extra clips, ammunition, and a .22-caliber, single-shot, bolt-action rifle. These items were introduced and passed to the jury at the close of evidence. Defendant argues that these items were not linked to the crimes for which he

was charged, and thus irrelevant, and that they prejudiced his case. Assuming arguendo that the admission of this evidence was error, we conclude there is no reasonable possibility that this evidence affected defendant's convictions. N.C.G.S. § 15A-1443(b) (1988).

At trial the State did not assert, either explicitly or implicitly, that any of the items referred to by defendant in this assignment of error were linked to the charged crimes in any manner. In fact, the only reference at trial to these items was by Officer Kraft, who explained that a Redfield scope "fits on a rifle" and "draws objects nearer, so you can see them better I guess." Further, the State introduced the .32-caliber, semi-automatic pistol and the Ruger, semi-automatic .22-caliber rifle found at defendant's apartment and linked those guns to a bullet and cartridge cases found at the crime scene. In light of the State's evidence, including defendant's inculpatory statement and the firearms found at his home which were linked to the crimes, and the minimal reference to these items at trial, there is no reasonable possibility that the admission of the other items found at defendant's home affected the outcome of his trial.

D.

[7] Defendant next challenges the trial court's excusing several prospective jurors for cause.

Juror DeLong stated that he had negative feelings toward the district attorney, but that he could apply the law fairly. Juror Joyner indicated that he knew the defendant but that he could give the State and defendant a fair trial. Juror Jackson stated that he did not want to spend the time necessary for a first-degree murder trial. Jurors Simpson, Sperlin, Andrews and Hubbard wavered on the issue of whether they could vote for the death penalty. All of these prospective jurors were removed for cause by the trial judge.

We find that, assuming arguendo, the trial court erred in excusing these jurors for cause, defendant has not shown that he was prejudiced. A defendant is not entitled to any particular juror. His right to challenge is not a right to select but to reject a juror. Defendant concedes that neither he nor the State exhausted their peremptory challenges, which evidences satisfaction with the jury which was empaneled. *State v. Atkinson*, 275 N.C. 288, 308-09, 167 S.E.2d 241, 253 (1969), *rev'd on other grounds*, 403 U.S. 948, 29 L. Ed. 2d 859 (1971); *State v. Vann*, 162 N.C. 534, 538, 77 S.E. 295, 297 (1913).

Defendant has not shown that he was harmed by the exclusion of jurors DeLong, Joyner and Jackson.

**[8]** Since defendant was not sentenced to death, he was not harmed by any improper exclusion of jurors on the basis of their death penalty views. *State v. Rannels*, 333 N.C. 644, 655, 430 S.E.2d 254, 260 (1993).

**[9]** Defendant also argues that the practice of death qualifying a jury violates his right to a fair trial. We have already held, however, that this practice is not unconstitutional. *State v. Taylor*, 332 N.C. 372, 420 S.E.2d 414 (1992). Thus this contention is without merit.

E.

In his final argument, defendant contends that the trial judge erred in permitting the district attorney to make certain remarks during closing arguments. We note at the outset that defendant failed to object to any of these comments and that our inquiry is therefore limited to whether the prosecutor's statements were grossly improper. *State v. Jolly*, 332 N.C. 351, 368, 420 S.E.2d 661, 671 (1992).

**[10]** In his opening statement, Mr. Osborn, counsel for defendant, stated that defendant and Ward originally intended to commit a breaking and entering, not a robbery. Defendant attempted to withdraw from the robbery but felt compelled to stay. They were armed only because of the vicious dogs they expected to encounter inside the mobile home. In closing arguments Mr. Osborn again made reference to the possibility that defendant went to the victim's house to break and enter.

During his closing argument, the district attorney referred to these assertions by Mr. Osborn:

> I heard Mr. Osborn say that the defendant—the defendant, Mr. Harris over here—went to this residence to commit a breaking and entering. Where did you hear that? Where? Seriously, now, folks; what witness said that? I've heard Mr. Osborn say that the defendant was carrying a gun because he was scared of dogs in this house. What witness said that? I heard Mr. Osborn say that David Ward pointed a gun, his gun, at the defendant and told him to shoot. What witness said that? I heard Mr. Osborn say that all of this, these events, were the idea of David Ward. What witness said that? Again, I'm talking to you about the ingenuity of counsel.

I suggest to you that's what you call smoke screen, folks. There's not one scintilla of evidence to support those remarks.

Defendant argues that the district attorney's closing arguments were an impermissible comment on his failure to testify. We disagree.

The district attorney's question "What witness said that?" was a fair response to the opening statements of defendant's counsel. Since the evidence did not support the facts contained in defendant's opening statement, it was not improper for the district attorney to highlight that absence of evidence.[3] Moreover, the district attorney's question focused on the defendant's failure to present evidence generally and in no way implicated the defendant's failure to testify. *Cf. State v. Wilson*, 322 N.C. 117, 139-40, 367 S.E.2d 589, 602 (1988) (State may refer to defendant's failure to offer evidence refuting State's case).

Defendant also challenges other statements made in closing arguments. The district attorney referred to the defendant as a "cold-blooded murderer" and a "doper" and characterized the defendant's act as "shooting her down just like a dog." He also referred to the defense strategy as "ingenuity of counsel."

It is well established that

counsel will be allowed wide latitude in the argument of hotly contested cases. Counsel for each side may argue to the jury the facts in evidence and all reasonable inferences to be drawn therefrom together with the relevant law so as to present his or her side of the case. Decisions as to whether an advocate has abused this privilege must be left largely to the sound discretion of the trial court.

*State v. Huffstetler*, 312 N.C. 92, 112, 322 S.E.2d 110, 123 (1984), *cert. denied*, 471 U.S. 1009, 85 L. Ed. 2d 169 (1985) (citations omitted).

[11-13] As this was a trial for first-degree murder involving a calculated armed robbery and an unprovoked killing, it was not improper for the State to refer to defendant as "cold-blooded murderer." Similarly, the State's and defendant's evidence showed that defendant had

---

3. In all fairness to the defense, we recognize that its opening statements were made with the expectation that it would later be able to introduce the statements defendant made to Dr. Brown. Those statements, however, have been held to be inadmissible as substantive evidence. The defendant's expectations of the admissibility of evidence do not deprive the State of the ability to point out that facts alluded to in opening statements were not supported by evidence introduced at trial.

a history of drug abuse and therefore the use of the word "doper," while colloquial, was an accurate term describing the defendant as portrayed by the evidence. The statement that the defendant shot her down "just like a dog" did not compare defendant to an animal. *Compare State v. Hamlet*, 312 N.C. 162, 321 S.E.2d 837 (1984) (references to defendant as an "animal" disapproved). The district attorney's reference to the defense strategy as "ingenuity of counsel" clearly was not "so grossly improper that the trial court abused its discretion in failing to intervene *ex mero motu* to correct the alleged error." *State v. Jolly*, 332 N.C. at 368, 420 S.E.2d at 671.

For the reasons given, we conclude defendant's trial was fair and free from prejudicial error.

NO ERROR.